SAN JACINTO METHODIST HOSPI-
TAL and New Triumph Healthcare of
Texas, LLC, d/b/a/ Triumph Hospital
East Houston, Appellants,

v.

Eric BENNETT, Individually and as
Representative of the Estate of Mary
Jane Taylor Deceased, Appellee.

No. 14–07–00639–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 29, 2008.

Callie Elizabeth Murphy, Iain Gordon Simpson, Oscar Luis De la Rosa, Charles C. Brennig III, Houston, for Appellants.

Jack Edward Little, Paula Elliott, Conroe, for Appellee.

Panel consists of Chief Justice HEDGES and Justices FROST and MURPHY.*

## OPINION

KEM THOMPSON FROST, Justice.

In this interlocutory appeal in a health-care-liability case, two hospitals challenge the trial court's denial of their respective objections to the plaintiff's expert witness report and motions to dismiss under Texas Civil Practice and Remedies Code section 74.351. We conclude the trial court reasonably could have determined that the plaintiff's expert report was sufficient to meet the relevant requirements of the statute in relation to all claims the plaintiff was asserting at the time of the trial court's orders. We therefore hold the trial court did not abuse its discretion in deny-

* Senior Chief Justice Paul Murphy sitting by assignment.

ing the hospitals' objections and motions to dismiss.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee Eric Bennett, individually and as representative of the estate of his mother, Mary Jane Taylor, filed a medical health care liability claim against appellants San Jacinto Methodist Hospital ("Methodist") and New Triumph Healthcare of Texas, LLC, d/b/a/ Triumph Hospital East Houston ("Triumph"). Bennett sought recovery under the Texas wrongful death and survival statutes [1] for injury and death allegedly resulting from Methodist's and Triumph's negligent diagnosis and treatment of his mother's dicubitus ulcer, commonly known as a "bed sore."

Bennett's petition contains the following allegations:

- On September 24, 2004, Taylor arrived at Methodist with breathing problems, and she was admitted to Methodist.
- During her stay at Methodist, she began to develop a bed sore. On November 15, 2004, Taylor was transferred to Triumph for management of respiratory failure.
- During her stay at Triumph, Taylor's bed sore progressed to stage four, penetrating to the bone.
- On November 30, 2004, Taylor returned to Methodist, and on January 11, 2005, she was transferred to Select Speciality Hospital, where she underwent skin grafts and a skin flap.
- Taylor remained hospitalized until October 27, 2005, when she died.

On April 9, 2007, Bennett timely filed a report by Dr. Timothy Hammond, "an academic internist and nephrologist." [2] Dr. Hammond stated he was "board certified in internal medicine and this certification is valid indefinitely. I was board certified in nephrology from 1996 to 2006 and am currently in the process of renewal. These certifications directly address the subject matter of this claim, as the claim relates to management of decubitus ulcers." Dr. Hammond also stated he was practicing medicine at all times relevant to the claims made in the case and was actively practicing at the time of his opinion. He continued, stating:

I have either has [sic] training as, and/or served as a consultant, and/or observed healthcare providers in the same fields as the defendant healthcare providers named in the Taylor case. Therefore, I have knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, as the claim relates to the prevention and management of decubitus ulcers. I am familiar with the standard of care for both nurses and physicians for the prevention and treatment of decubitus ulcers. I give direct care to patients with decubitus ulcers and was doing so at all times relevant to this case. As such, I am also familiar with the consequences of improper management of decubitus ulcers that is not within the standard of care.

After listing the records he reviewed and summarizing the details of Taylor's clinical and medical history, Dr. Hammond opined that the following evidence supported the claim that Taylor's skin integrity was breached during her first stay at Methodist: (1) a January 12, 2005 wound care progress note from Select Speciality Hospital indicating the "sacral decubiti are 2½ months old," and (2) inclusion of an

---

1. TEX. CIV. PRAC. & REM.CODE ANN. § 71.001–.022 (Vernon 1997 & Supp. 2007).

2. Nephrology is "the science that deals with the kidneys, esp. their structure, functions, or diseases." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1517 (1993).

order for Duoderm to the sacrum in the November 15, 2004 transfer orders to Triumph. Dr. Hammond also opined that Taylor's laboratory results from Methodist were "consistent with prolonged dehydration and malnutrition as evidence[d] by BUN/Creatinine rations [sic] >20 (Ratio) and low albumin and pre-albumin levels...." He then provided the supporting tabulations.

Regarding Taylor's stay at Triumph, Dr. Hammond reported, among other matters, that Taylor "developed Pseudomonas bacteremia, and had ongoing malnutrition." [3] He further observed that a sacral decubitus was noted in the hospital discharge summary, but no skin care documentation was included in this record. He provided the pre-albumin levels in Taylor's blood and the elevated BUN-to-creatinine ratios, which he explained provided evidence of poor nutrition and poor hydration, respectively. He observed that, on Taylor's readmission to Methodist, a "nursing assessment lists skin as impaired, and integumentary assessment as Stage II pressure ulcer to buttocks. Initial wound assessment on 12/01/2004 documents 6 cm by 7cm sacral area wound ... and Stage 3on [sic] the wound care assessment records." [4] Finally, Dr. Hammond observed, "The [Methodist] ICU nursing progress notes list the decubitus as Stage 4 on 12/2/2004 and repeatedly through 12/20/2004."

Regarding the general standard of care for decubitus ulcers, Dr. Hammond stated in his report:

The standard care for decubitus ulcers is to make an initial survey of skin integrity, assess risk for ulcers with a scale such as the Braden scale, and follow up with skin care nursing and protocol interventions when decubitus ulcers are detected. The patients should have their nutrition and hydration optimized to prevent formation of new ulcers and enhance healing of existing ulcers. There should be a process of ongoing assessment[,] reassessment[,] and care planning to prevent, detect, and manage decubitus ulcers, and treatable predisposing factors such as nutrition and hydration.

Hammond then repeated, virtually verbatim, the same standard of care for the staffs of Methodist and Triumph.

Under the heading of "breaches of the standard of care," Dr. Hammond stated the following regarding Methodist's staff:

The staff of San Jacinto Methodist Hospital breached the standard of care by failing to perform an initial survey of skin integrity, assessment for risk for ulcers with a scale such as the Braden scale, and following up with skin care nursing and protocol interventions when decubitus ulcers were detected. The staff of San Jacinto Methodist Hospital breached the standard of care by not optimizing the patient's nutrition and hydration to prevent formation of new ulcers and enhance healing of existing ulcers. The staff of San Jacinto Methodist Hospital breached the standard of care by failing to perform ongoing assessment, reassessment and care planning to prevent, detect, and manage decubitus ulcers, and treatable predisposing factors such as poor nutrition and hydration.

The breaches of the standard of care by the staff of San Jacinto Methodist Hospital were the proximate cause of Ms. Taylor's decubitus ulcer formation and failure to heal, poor nutrition and poor hydration as specifically set forth below.

---

3. Pseudomonas is a genus of bacteria. See id. at 1831.

4. An "integument" refers to something that covers or encloses, see id. at 1174, in this case, the skin.

The staff of San Jacinto Methodist Hospital, by not optimizing the patient's nutrition and hydration caused the formation of decubitus ulcers. Furthermore, the staff of San Jacinto Methodist Hospital breached the standard of care by failing to perform ongoing assessment, reassessment and care planning to prevent, detect, and manage decubitus ulcers, and treatable predisposing factors such as poor nutrition and hydration breaches of the standard of care were the proximate cause of Ms. Taylor's decubitus formation and failure to heal a decubitus, together with poor nutrition and poor hydration.

By failing to perform an initial survey of skin integrity, assessment for risk for ulcers with a scale such as the Braden scale, and following up with skin care nursing and protocol interventions when decubitus ulcers were detected, as well as failing to optimize the patient's nutrition and hydration to prevent formation of new ulcers and enhance healing of existing ulcers as well as failing to perform ongoing assessment, reassessment and care planning to prevent, detect, and manage decubitus ulcers, and treatable predisposing factors such as poor nutrition and hydration. The staff of San Jacinto Methodist Hospital allowed the patient to develop decubitus formation and further promoted failure to heal through poor nutrition and poor hydration. The care provided to Mary Jane Taylor by the staff of San Jacinto Methodist was below the community standard of care, and did harm to Ms. Taylor, being the proximate cause of her decubitus formation and failure to heal because of poor nutrition and poor hydration. Specifically, the staff of San Methodist Hospital breached the standard of care by failure to ensure an initial survey of skin integrity, assessment for risk for ulcers with a scale such as the Braden

scale, and follow up with skin care nursing and protocol interventions when decubitus ulcers were detected. The staff of San Jacinto Methodist Hospital breached the standard of care by not optimizing the patient's nutrition and hydration to prevent formation of new ulcers and enhance healing of existing ulcers. The staff of San Jacinto Methodist Hospital breached the standard of care by failing to perform ongoing assessment reassessment and care planning to prevent, detect, and manage decubitus ulcers, and treatable predisposing factors such as poor nutrition and hydration.

Had the standard of care been met by the staff of San Jacinto Methodist Hospital as outlined above, the specific outcome, based upon reasonable medical probability, would have been prevention and healing of decubitus formation, and maintenance of good nutrition and hydration.

Dr. Hammond then repeated verbatim the same opinion regarding the breaches of the standard of care by Triumph's staff.

After providing a legal definition of "proximate cause," including the concepts of cause in fact and foreseeability, Dr. Hammond opined:

The breaches of the standard of care by the staff of San Jacinto Methodist Hospital were a proximate cause of Ms. Taylor's injuries, which included decubitus formation, failure to heal, and poor nutrition and hydration.

The breaches of the standard of care by the staff of Triumph Hospital—East Houston were a proximate cause of Ms. Taylor's injuries, which included decubitus formation, failure to heal, and poor nutrition and hydration.

Methodist objected to the sufficiency of Dr. Hammond's report as being "wholly conclusory as to any causative link be-

tween the alleged negligence of each respective hospital and [Taylor's] adverse outcome," and "wholly devoid of any opinion linking [Methodist's] conduct to [Taylor's] death." Methodist also argued Dr. Hammond was not qualified to give an opinion on causation, stating, "Specifically, Dr. Hammond has no particular training, qualifications or experience in wound care. He is merely an internist and nephrologist...."

Triumph objected to the sufficiency of Dr. Hammond's report, arguing, "[T]he report is conclusory as to the element of causation. In addition, the expert report prepared by Dr. Hammond fails to explain how the alleged negligence of Defendant was a but for or proximate cause of the damages claimed by Plaintiff." Triumph also argued Dr. Hammond was not qualified, under Texas Civil Practice and Remedies Code section 74.402(b)(2), to give an opinion regarding the accepted standards of care for wound care because he was not actively practicing wound care at the time of the events in question or at the time he gave his opinions.

The trial court heard Methodist's and Triumph's objections and found Dr. Hammond qualified. Methodist and Triumph then orally moved to dismiss the case.[5] By written order entered the same day, the trial court denied Methodist's and Triumph's objections and motions to dismiss. Methodist and Triumph filed separate notices of appeal and have filed separate appellate briefs.[6]

## II. ISSUES PRESENTED AND STANDARD OF REVIEW

In its sole issue, Methodist argues the trial court abused its discretion by denying its motion to dismiss. Likewise, Triumph, in its sole issue, argues the trial court abused its discretion by overruling its objection to the adequacy of Dr. Hammond's expert report and denying its motion to dismiss. In the trial court, both hospitals challenged Dr. Hammond's qualifications and the sufficiency of his report on the element of causation.[7] Bennett, as the proponent of the expert, had the burden to show that the expert was qualified and the expert report satisfied the statutory requirements. *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 757 (Tex. App.–Houston [14th Dist.] 2007, no pet.).

We review a trial court's decision regarding the adequacy of an expert report and its decision on a defendant's motion to dismiss under an abuse-of-discretion standard. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex.2001) (construing former statute). We apply the same standard to a trial court's determination that an expert is qualified. *See Broders v. Heise*, 924 S.W.2d 148, 151–52 (Tex.1996). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002) (per curiam).

We may not reverse a trial court's discretionary ruling simply because we

---

5. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)(2), (c), (*l*) (Vernon Supp. 2007).

6. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(9) (Vernon Supp. 2007); *Lewis v. Funderburk*, 253 S.W.3d 204, 207–08, 51 Tex. Sup.Ct. J. 747, 748–49 (Tex. 2008).

7. On appeal, Methodist does not challenge Dr. Hammond's qualifications, but challenges the sufficiency of the report on standard of care. Even given the most generous reading, Methodist's trial court objection and argument lack an objection to the sufficiency of Dr. Hammond's report on standard of care; the only objection Methodist voiced was to Dr. Hammond's qualifications to give an opinion on standard of care.

might have decided it differently. *See Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex.2003) (construing former statute).[8] A trial court, however, has no discretion in determining what the law is or applying the law to the facts; therefore, a trial court's failure to apply or analyze the law correctly is an abuse of discretion. *Sanjar v. Turner*, 252 S.W.3d 460, 463–64 (Tex. App.-Houston [14th Dist.] 2008, no pet.).

## III. ANALYSIS

### A. Is Dr. Hammond qualified to render an opinion on the standard of care?

Triumph asserts Dr. Hammond is not qualified to render an opinion on the standard of care.[9] In the trial court, Triumph argued Dr. Hammond is "not qualified to render opinions regarding the medical issues specific to this case, wound care." On appeal, Triumph expands this argument and contends Dr. Hammond is not qualified to render an opinion on the standard of wound care by professional nurses. Assuming, without deciding, Triumph, in its trial argument, sufficiently preserved the argument it makes on appeal, we disagree.

■ The Texas Legislature, in Texas Civil Practice and Remedies Code section 74.402, has specified requirements for qualifying a person as an expert witness in a suit against a health care provider:

In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

*Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992) (emphasis added) (citations omitted).

8. In the context of a mandamus proceeding, the Texas Supreme Court explained:
 With respect to resolution of factual issues or matters committed to the trial court's discretion ... the reviewing court may not substitute its judgment for that of the trial court. *The relator must establish that the trial court could reasonably have reached only one decision.* Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable.

9. In the trial court, Methodist challenged Dr. Hammond's qualifications to render an opinion on the question of causation because he allegedly had "no particular training, qualifications or experience in wound care." On appeal, Methodist does not challenge Dr. Hammond's qualifications on either causation or standard of care.

(2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b), (c) (Vernon 2005).[10] Our analysis of the qualifications of an expert is limited to the four corners of the expert's report and curriculum vitae. *See Burrell,* 230 S.W.3d at 758 (regarding analysis of qualifications under section 74.351, which, in turn, contains a reference to section 74.402).

■ In his report, Dr. Hammond stated he was practicing medicine at all times relevant to the claims made in the case and was actively practicing at the time of his opinion. He is board certified in internal medicine and had been board certified in nephrology from 1996 to 2006, *i.e.,* a period overlapping the time Taylor's injury allegedly occurred. Dr. Hammond stated that the two certifications "directly address the subject matter of this claim, as the claim relates to management of decubitus ulcers." Dr. Hammond indicated, because he had either trained, served as a consultant to, or observed health care providers in the same fields as the defendants, he has knowledge of the accepted standards of medical care for the diagnosis, care, and treatment related to the prevention and management of decubitus ulcers. He further stated he is "familiar with the standard of care for both nurses and physicians for the prevention and treatment of decubitus ulcers." Finally, Dr. Hammond explained, "I give direct care to patients with decubitus ulcers and was doing so at all times relevant to this case. As such, I am also familiar with the consequences of improper management of decubitus ulcers that is not within the standard of care."

Dr. Hammond's statement of his qualifications compares favorably to that held sufficient in *Burrell* in the face of a challenge to the expert's qualifications under subsections 74.402(b)(2) and (3). *Burrell,* 230 S.W.3d at 759. In that case, the expert described his qualifications as follows:

I completed a fellowship in infectious disease and have practiced for over 25 years in infectious disease. I am a frequent speaker at various regional and national medical conferences and have been a consultant for the Massachusetts Department of Health. I have reviewed various medical records concerning Katie Whitfield and I am familiar with the standard of care as it pertains to prevention and treatment of decubitus ulcers. I have experience in instructing nurses and other personnel in the proper techniques to prevent decubitus ulcers and I have treated patients with decubitus ulcers over the course of my practice as an infectious disease, internist and occupational doctor.

*Id.* at 763.[11] *See also Group v. Vicento,* 164 S.W.3d 724, 734 (Tex.App.-Houston

---

10. For purposes of section 74.402, " 'practicing health care' includes: (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider." TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(a) (Vernon 2005). "Includes" is a term of enlargement, not limitation, and therefore these two definitions are not exclusive. *Group v. Vicento,* 164 S.W.3d 724, 731 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

11. We acknowledge, in analyzing the expert's qualifications, the *Burrell* court referred to the "clear, fact-based explanations of the standards of care" section of that report. *Burrell,* 230 S.W.3d at 760. We also acknowledge the standard-of-care section in the report in the present case does not contain the same degree of detail as the report in *Burrell.* Nevertheless, comparable to the expert in *Burrell,* Dr. Hammond specifically stated he has given direct patient care to patients with decubitus ulcers.

[14th Dist.] 2005, pet. denied) (holding anesthesiologist, who used same pain management modalities as do chiropractors was "practicing health care" in a field of practice that involved same type of care as chiropractor, thus satisfying subsection 74.402(b)(1), and doctor's statement he had knowledge of accepted standard of care for injury or illness at issue satisfied section 74.402(b)(2)).

Triumph, however, argues that Dr. Hammond is not qualified to establish the standard of care for professional nurses. In support, it relies primarily on the majority opinion in *Simonson v. Keppard*, 225 S.W.3d 868 (Tex.App.-Dallas 2007, no pet.), a case in which the Fifth Court of Appeals concluded that the trial court abused its discretion when it denied a nurse practitioner's motion to dismiss. *Id.* at 874. In the motion, the nurse had argued that the expert report was inadequate because the expert doctor was not qualified to give an opinion on the standard of care for a nurse practitioner. *Id.* The *Simonson* majority observed that "[n]owhere in his affidavit does Dr. Thomas state that he either has knowledge of the standard of care applicable to nurse practitioners or that he has ever worked with or supervised nurse practitioners." *Id.* at 872. In contrast, in the present case Dr. Hammond specifically stated, "I am familiar with the standard of care for both nurses and physicians for the prevention and treatment of decubitus ulcers." Thus, *Simonson* is distinguishable.

Moreover, in reaching its conclusion, the *Simonson* majority relied on *Cox v. Vanguard Health Systems, Inc.*, No. 04–04–00762–CV, 2005 WL 2367582 (Tex.App.-

San Antonio, Sept. 28, 2005, pet. denied) (mem.op.) and *Jones v. Ark–La–Tex Visiting Nurses*, 128 S.W.3d 393 (Tex.App.-Texarkana 2004, no pet.).[12] In holding the experts were not qualified in those cases, the appellate courts were affirming the trial courts' discretionary decisions. Additionally, as the *Simonson* dissent observes,

Those cases were decided under section 74.402(b)'s predecessor, which defined "expert" opining about non-physician health care providers as having "knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim." Current section 74.402(b)(1) added language requiring experts opining about "health care providers" to be practicing health care in a "field of practice that involves the same type" of care. This may explain a different emphasis by these courts on a specific category of caregiver.

*Simonson*, 225 S.W.3d at 883 (O'Neill, J., dissenting) (footnote omitted).

Given the difference between the expert report in *Simonson* and the one under consideration in the present case and given the case law on which *Simonson* relies, we decline to follow *Simonson*. We overrule Triumph's issue to the extent Triumph challenges the expert's qualifications.

**B. Is Dr. Hammond's report sufficient on the element of causation?**

Both Methodist and Triumph argue that Dr. Hammond, in his report, does not sufficiently address the relationship between the alleged breaches of the standard of care and Taylor's alleged injury.[13]

12. Triumph also cites *Cox* and *Jones* in support of its argument.

13. Additionally, Methodist argues Dr. Hammond did not properly define the standard of care. Methodist, however, did not present this argument to the trial court. *See* note 6, *supra*. Methodist therefore has not preserved

this complaint for appellate review. *See* Tex. R.App. P. 33.1(a); *see also Ellis v. McKinney*, No. 01–00–01098–CV, 2001 WL 1445892, at *3 (Tex.App.-Houston [1st Dist.] Nov. 15, 2001, pet. denied) (not designated for publication) ("[A] trial judge does not abuse his discretion for not considering grounds that were not presented to him.").

Methodist argues that in the report Dr. Hammond completely fails to address how Methodist's actions allegedly caused Taylor's death and further argues the description of the causal relationship between Methodist's alleged breaches of the standard of care and Taylor's damages is wholly conclusory, and that Dr. Hammond fails to identify the mechanism of injury. Triumph argues Dr. Hammond's opinions are illogical, speculative, and conclusory.[14]

Under Texas Civil Practice and Remedies Code section 74.351(r)(6),

> "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp. 2007). "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id.* § 74.351(*l*).

 Thus, when a trial court considers a motion to dismiss under section 74.351(*l*), the issue "is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report." *Wright*, 79 S.W.3d at 52 (constru-

ing former statute and quoting *Palacios*, 46 S.W.3d at 878). To constitute a "good-faith effort," the report must, for each defendant, provide a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the injury, harm, or damages claimed. *Palacios*, 46 S.W.3d at 878. The report must provide enough information to fulfill two purposes: (1) to inform the defendant of the specific conduct the plaintiff has called into question and (2) to provide a basis for the trial court to conclude that the claims have merit. *Id.* at 879. Under *Palacios*, the only information relevant to the inquiry is the information contained within the four corners of the document. *Id.* at 878. Finally, in the report the plaintiff need not marshal all of her proof, but must include the expert's opinion on each of the three elements the statute identifies: (1) standard of care, (2) breach, and (3) causal relationship. *Id.*

***Wrongful death claim.*** Methodist argues Dr. Hammond completely failed to address how Methodist's actions caused Taylor's death. Bennett concedes Dr. Hammond did not provide an opinion on the cause of Taylor's death. However, Bennett repeatedly asserts that he is not making a claim for Taylor's wrongful death. Unlike his prior pleadings, Bennett's second amended petition (the live pleading at the time the trial court entered the orders at issue), does not contain a citation to the wrongful death statute and

---

14. Triumph also argues Dr. Hammond ignored facts documented in the medical record. To support this argument, Triumph refers to documents, attached to its brief, which are not part of the appellate record and information outside the four corners of the report. We cannot consider this documentation. *See Cherqui v. Westheimer Street Festival Corp.*, 116 S.W.3d 337, 342 n. 2 (Tex.App.-Houston [14th Dist.] 2003, no pet.) ("[W]e cannot

consider documents attached as appendices to briefs and must consider a case based upon the record filed."); *Palacios*, 46 S.W.3d at 878 ("[T]he only information relevant to the inquiry [of whether the report represents a good faith effort to comply with the statute] is within the four corners of the document."). Thus, Triumph cannot prevail on this argument.

does not contain damage allegations related to Taylor's death. We conclude Bennett is not pursuing a wrongful death claim and that he is not claiming damages based on Taylor's death. Therefore, the lack of opinion on the cause of Taylor's death is not relevant to the sufficiency of the report in stating Dr. Hammond's opinions about the causal relationship between the failure to meet the applicable standard of care and the injury, harm, or damages claimed. *Cf. Alexander v. Terrell*, No. 09–07–00198–CV, 2007 WL 2683536, at *1, *4 (Tex.App.-Beaumont, Sept. 13, 2007, no pet.) (mem. op.) (concluding trial court did not abuse discretion in denying defendant's motion to dismiss survival claims regarding alleged negligence in failing to monitor skin condition, even though report was inadequate to support wrongful death claim).[15]

■ *Other injuries.* The injuries at issue are the alleged formation and worsening of Taylor's decubitus ulcers. Methodist argues that Dr. Hammond's report is conclusory because in it Dr. Hammond fails to explain the mechanism of injury, that is, how the alleged breach caused Taylor's ulcer. Triumph argues Dr. Hammond's report is inaccurate and illogical because, although Dr. Hammond reports Taylor had an ulcer when she was admitted to Triumph, Dr. Hammond charges Triumph with causing formation of the ulcer. Triumph also faults Dr. Hammond for not specifying how each defendant's conduct caused the injury and for not explaining how, absent the alleged breaches, Taylor's outcome would have been different.

In two separate paragraphs, Dr. Hammond assigned identical standards of care to both Methodist and Triumph. In two separate paragraphs dealing with breaches of the standard of care, he stated the following regarding each hospital:

> The staff ..., by not optimizing the patient's nutrition and hydration caused the formation of decubitus ulcers. Furthermore, the staff ... breached the standard of care by failing to perform ongoing assessment, reassessment and care planning to prevent, detect, and manage decubitus ulcers, and treatable predisposing factors such as poor nutrition and hydration breaches of the standard of care were the proximate cause of Ms. Taylor's decubitus formation and failure to heal a decubitus, together with poor nutrition and poor hydration.

Thus, in the preceding paragraph Dr. Hammond set forth two causal links. First, he linked each staff's alleged failure to prevent, detect, and manage Taylor's nutrition and hydration (as examples of treatable predisposing factors) to the ulcers' formation and failure to heal. Second, he linked each staff's alleged failure to prevent, detect, and manage the ulcers to the ulcers' failure to heal. Dr. Hammond also stated:

> By failing to perform an initial survey of skin integrity, assessment for risk for ulcers with a scale such as the Braden scale, and following up with skin care nursing and protocol interventions when decubitus ulcers were detected, as well as failing to optimize the patient's nutrition and hydration to prevent formation of new ulcers and enhance healing of existing ulcers as well as failing to perform ongoing assessment, reassessment and care planning to prevent, detect, and manage decubitus ulcers, and treat-

---

**15.** Having successfully represented to this court that he is not seeking recovery on a wrongful death claim, Bennett cannot take a contradictory position in subsequent proceedings. *See Charles Brown, L.L.P. v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 899–900 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (discussing judicial estoppel and judicial admission).

able predisposing factors such as poor nutrition and hydration. [sic] The staff ... allowed the patient to develop decubitus formation and further promoted failure to heal through poor nutrition and poor hydration.

In the preceding paragraph, Dr. Hammond thus added an additional causal link. He linked each staff's failure to perform an initial survey of skin integrity and assessment for risk of ulcers to Taylor's development of ulcers.

Finally, in two separate paragraphs, Dr. Hammond stated with regard to each hospital staff:

Had the standard of care been met by the staff ... as outlined above, the specific outcome, based upon reasonable medical probability, would have been prevention and healing of decubitus formation, and maintenance of good nutrition and hydration.

In response to Methodist's argument, we conclude Dr. Hammond's report sets forth the mechanism of Taylor's injury, specifically (1) failure to provide adequate initial skin assessment, hydration, and nutrition led to the formation of ulcers, and (2) failure to provide skin care nursing and protocol interventions when decubitus ulcers were detected, as well as failing to optimize Taylor's nutrition and hydration led to formation of new ulcers and prevented healing of existing ulcers. Regarding Triumph's contention that Dr. Hammond's report was inaccurate and illogical, we conclude the trial court reasonably could have concluded otherwise in light of Dr. Hammond's references both to an "ulcer" and to "ulcers" and his reference to the formation of new ulcers, thus admitting of the possibility that Taylor arrived at Triumph with an ulcer and additional ulceration occurred while she was there.

Although Dr. Hammond's opinion for each defendant is identical, he unquestionably provided an opinion for each hospital. That he held each defendant to the same standard of care, found the same type of breach, and analyzed causation in the same way does not render his opinion inadequate. *See Sanjar,* 252 S.W.3d at 466–68 (stating, "nothing in *Taylor* [*v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 244 (Tex.App.-Corpus Christi 2004, no pet.),*] explicitly forbids applying the same standard of care to more than one physician if, as in the present case, they all owed the same duty to the patient" and further holding report sufficient on causation); *see also Packard v. Guerra,* 252 S.W.3d 511, 527–28 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.) (rejecting contention that expert reports were insufficient because experts assigned defendants the same duties and obligations).

Finally, Dr. Hammond indicated, with regard to each defendant, that if each hospital had followed the appropriate standard of care, Taylor would have maintained good nutrition and hydration, ulcer formation would have been prevented, and those ulcers already present would have healed. Although Dr. Hammond's report could have been more specific, we cannot say the trial court's conclusion that it was sufficient constituted an abuse of discretion. *See Sanjar,* 252 S.W.3d at 466–68.[16]

The majority of the cases on which Methodist and Triumph rely are appeals from dismissals of health care liability claims. The appellate courts, in holding the experts' reports were insufficient in those cases, were affirming the trial court's exercise of discretion. In contrast, the present case is an appeal from the trial court's denial of a motion for dismissal.

16. As an example of a more specific report in a case involving decubitus ulcers, *see Alexander,* 2007 WL 2683536, at *2; *Agana v. Terrell,* No. 09–07–088–CV, 2007 WL 1793786, at *1, *2 (Tex.App.-Beaumont, June 21, 2007, *no pet.*) (mem.op.)

Accordingly, we question the usefulness of Methodist's and Triumph's cited cases in analyzing the present one.

We consider *Gallardo v. Ugarte*, more instructive. 145 S.W.3d 272 (Tex.App.-El Paso 2004, pet. denied). In that case, the appellate court reversed a trial court order finding the expert report deficient and dismissing the case. *Id.* at 274. The *Gallardo* court concluded the report was sufficient, despite the trial court's conclusion to the contrary. Significantly, on the element of causation, the report in *Gallardo* compares favorably to the report in the present case.

The *Gallardo* court summarized the relevant part of the report addressing decubitus ulcers as follows:

> Regarding decubitus ulcers, the report states that Gallardo had a stage II decubitus ulcer on his right hip on and off from January to April 1999. By May 1999, the decubitus progressed to stage IV and eventually developed into cellulitis, requiring in-patient management with intravenous antibiotics and "surgical debridement with flap." From May 3 to mid-June, the treatment was not changed although the wound was clearly getting worse. The report further states:
>
> > On March 1, 1999, the Treatment Nurse recommended a water mattress. The records do not reflect that Mr. Gallardo received a water mattress or any other type of off loading mattress. There are comments on the CDR noting that this (right hip decubitus) is a recurring problem and that resident favors his right side. However, neither Dr. Ugarte nor the Treatment Nurse address preventative measures except for recommending a water mattress which Mr. Gallardo did not get. Nor did he receive any other type of off loading mattress. More frequent checks by the CNA to

insure he maintained a position change every two hours, padding his bed in such a manner as to maintain him in position and Granulex spray to pressure points are but a few of the things that ... could have been done to prevent as well as treat the decubitus. There is no evidence in the record that Mr. Gallardo received any of these preventive measures.

> The report indicates that Sunset's nurses did not always inform Ugarte of changes in Gallardo's condition, including changes related to decubitus. But the report also indicates that Ugarte saw Gallardo during the period that he had the decubitus, although it is not clear how often Ugarte saw him. The report states that a nurse consulted with Ugarte regarding decubitus on July 5. The next day, Ugarte saw Gallardo and admitted him to the hospital for the problem. Ugarte's progress notes for that day contain his first mention of decubitus.

*Id.* at 278–78 (footnote omitted).

In analyzing the sufficiency of the report in relation to decubitus ulcers, the *Gallardo* court addressed causation in the following context:

> We conclude that the report represents a good-faith effort to provide a fair summary of Kirk's [the expert's] opinions. Regarding decubitus ulcers, the report states that more frequent checking by the CNA to insure that Gallardo maintained a position change every two hours, padding his bed, and applying Granulex spray "are but a few of the things that ... could have been done to prevent as well as treat the decubitus. There is no evidence in the record that Mr. Gallardo received any of these preventive measures." This statement explains the standard of care by listing the steps that could have been taken and

explains how the standard of care was breached by noting that none of the steps were taken. Thus, the statement specifically addresses what care was expected but not given. *The statement addresses causation by indicating that if the proper steps had been taken, the decubitus could have been prevented or at least could have been prevented from progressing to stage IV. Although the statement does not use the word "causation," the words "could have been done to prevent as well as treat the decubitus" adequately convey the idea that failure to take the proper steps caused the decubitus or caused it to get worse.* Moreover, the report indicates that Ugarte undertook to treat Gallardo for the decubitus and Kirk expressly faults him for not ordering the proper steps to be taken.

*Id.* at 279–80 (emphasis added) (citations omitted).

If the expert providing the report in *Gallardo* addressed causation well enough that the appellate court could hold the trial court abused its discretion in finding the report inadequate and dismiss the case, certainly Dr. Hammond's treatment of the issue in his report is sufficient to enable this court to conclude that the trial court in the present case did not abuse its discretion in overruling the hospitals' objections and denying their motions to dismiss.

## IV. CONCLUSION

The trial court did not abuse its discretion in overruling Methodist's and Triumph's objections to Dr. Hammond's report and in denying their motions to dismiss. We therefore affirm the orders of the trial court.