**Affirmed and Memorandum Opinion filed February 9, 2012.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00392-CV

---

### REBECCA MAXWELL, M.D., Appellant

### V.

### DONNA T. MARTIN, INDIVIDUALLY AND AS INDEPENDENT ADMINISTRATRIX OF THE ESTATE OF DAVID R. MARTIN, SR. AND AS NEXT FRIEND OF DEVIN T. MARTIN AS SURVIVOR OF DAVID R. MARTIN, SR., Appellee

---

**On Appeal from the 164th District Court
Harris County, Texas
Trial Court Cause No. 2010-37659**

---

## M E M O R A N D U M   O P I N I O N

In this health-care-liability suit, appellant, Rebecca Maxwell, M.D., appeals the trial court's order denying Dr. Maxwell's motion challenging sufficiency of the amended expert report served by appellee, Donna T. Martin, Individually and as Independent Administratrix of the Estate of David R. Martin, Sr. and as Next Friend of Devin T. Martin As Survivor of David R. Martin, Sr.[1]  In her sole issue, Dr. Maxwell contends the

---

[1] We will refer to appellee as "Martin" and her late husband, the subject patient, as "David."

expert failed to sufficiently describe the applicable standard of care, Dr. Maxwell's alleged breach of such standard, and a causal relationship between any breach and the damages claimed. We affirm.

## I. BACKGROUND[2]

After David was discharged from the United States Army in the 1990s, he was diagnosed with several psychiatric disorders, including Post Traumatic Stress Disorder ("PTSD"), Bipolar Disease, and "ADHD." On April 14, 2008, David, who was then forty-five years old, requested admission to Intracare Hospital for detoxification from addiction to Benzodiazepine and opiate narcotics. When admitted, David said he was taking twenty to thirty pills per day each of Valium (a brand of Benzodiazepine) and Vicodin (a brand of opiate narcotic) and ten other prescription medications, including Buproprion, Trazodone, and Depakote (which contains Volproic acid).[3] David also reported he was experiencing "intermittent visual hallucinations." It was noted in the hospital records that he was "actively hallucinating during assessment . . . patient having more frequent verbal hallucinations and aggression . . . grandiose and hypersexual."

Dr. Maxwell treated David during his hospitalization and diagnosed "Substance Dependence" in addition to the previously-diagnosed psychiatric disorders. Dr. Maxwell continued David on the medications he was taking when admitted although she ultimately eliminated one such medication, Ambien, and lowered the dosage of Depakote. At the outset of admission, Dr. Maxwell also placed David on "Dr. Jason Baron's Opiate Withdrawal Protocol" ("the protocol"), which consisted of Trazodone and six medications additional to those he was taking when admitted. A urinalysis subsequently performed during the hospitalization revealed that David either was not addicted to Benzodiazepine or opiates or had not recently taken those drugs. However, Dr. Maxwell

---

[2] In her live petition, Martin does not detail any factual background and instead pleads only various acts of negligence allegedly committed by the defendants, including Dr. Maxwell. Therefore, we have gleaned from the expert report the factual background that appears undisputed at least for purposes of Dr. Maxwell's motion and this appeal.

[3] At one point in his report, the expert referred to "nine" prescription medications but later listed ten such medications. Nevertheless, this discrepancy is immaterial to our disposition.

2

did not discontinue the protocol. At some point, David was also given an anti-psychotic medication.

The hospital records note David was "shakey [sic] . . . anxious . . . nausea . . . racing thoughts at night . . . hallucinating . . . very confused and irritable" on April 16, 2008 and "exhibiting an unsteady gait . . . sedated state" by that night. On the morning of April 17, 2008, medical personnel found David dead in his hospital bed. The autopsy report reflected that David died from "Polydrug toxicity due to Buproprion, Trazodone and Valproic acid."

Martin filed this health-care-liability claim on behalf of herself, David's estate, and his son against Dr. Maxwell and several other defendants. In her live petition, Martin's sole allegation against Dr. Maxwell is a contention that she "negligently order[ed] a dangerous detox drug protocol unnecessarily causing severe drug toxicity and death."

Martin timely served all parties with an expert report of George S. Glass, M.D., P.A., a psychiatrist. Only Dr. Maxwell filed a motion challenging sufficiency of the report relative to Dr. Glass's opinions on the applicable standard of care, Dr. Maxwell's alleged breach of such standard, and the causal relationship between any breach and David's death. The trial court conducted a hearing on Dr. Maxwell's motion. However, there is no reporter's record of the hearing or written order on the motion in the appellate record. In her appellate brief, Martin asserts the trial court orally overruled all objections to the report yet "improperly" ordered Martin to serve an amended report to make the report "idiot proof." In Dr. Maxwell's appellate brief, she does not directly dispute this assertion. However, in trial court proceedings relative to the amended report, Dr. Maxwell suggested that the court had found the original report was deficient but, instead of dismissing the claim, ordered Martin to file an amended report.[4]

---

[4] At a hearing (which *was* recorded) relative to the amended report, Dr. Maxwell reminded the trial court that it had found the original report was deficient but ordered Martin to serve an amended report to make the report "idiot proof." The trial court merely responded, "I do remember saying idiot-

3

In any event, Martin served an amended report (hereinafter "the report"). Dr. Maxwell filed a motion challenging sufficiency of this report relative to the same elements he challenged with respect to the original report. In her response, Martin argued that Dr. Maxwell's motion was untimely. After a hearing, the trial court signed orders ruling Dr. Maxwell's motion was timely but denying the motion. Dr. Maxwell now presents this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (West Supp. 2011) (authorizing interlocutory appeal from order denying motion to dismiss health-care-liability claim on ground that expert report was inadequate).

## II. ANALYSIS

Chapter 74 of the Texas Civil Practice and Remedies Code governs Martin's health-care-liability claim. *See generally* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507 (West 2011 & Supp. 2011). Under this chapter, "a claimant shall, not later than the 120th day after the date the original petition was filed," serve on a defendant physician "one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted." *Id.* § 74.351(a). If "an expert report has not been served within" the 120-day period, on the defendant's motion, the trial court "shall," subject to section 74.351(c), dismiss the claim with prejudice. *Id.* § 74.351(b). If a report is served, a defendant physician must file and serve any objections to the sufficiency of the report "not later than the 21st day after the date it was served. . . ." *Id.* § 74.351(a). If an expert report has not been served within the 120-day period "because elements of the report are found deficient," the trial court may grant one thirty-day extension for the plaintiff to cure the deficiency. *Id.* § 74.351(c).

An "expert report" is defined as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician . . . failed to

---

proof. Yes." Therefore, the trial court's comment does not clarify whether it previously made an oral ruling that the original report was deficient.

meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). The expert may not merely state his conclusions about these elements but instead must explain the basis for his statements and link his conclusions to the facts. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001); *Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The trial court should grant a motion challenging adequacy of an expert report only if it appears to the court, after a hearing, that the report does not represent an objective good-faith effort to comply with the statutory definition of an expert report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l). When determining if a good-faith effort has been made, the trial court is limited to the four corners of the report and may not consider extrinsic evidence. *See Palacios*, 46 S.W.3d at 878; *Pokluda*, 283 S.W.3d at 117.

We employ an abuse-of-discretion standard to review a trial court's determinations regarding adequacy of an expert report in a health-care-liability suit. *Palacios*, 46 S.W.3d at 875; *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam); *Bennett*, 256 S.W.3d at 811.[5]

---

[5] As we have mentioned, the record does not reflect that the trial court ruled the original report was deficient, and, during proceedings relative to the amended report, the parties disputed whether the court made such a ruling on the original report; yet the court ordered Martin to serve an amended report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c) (authorizing trial court to grant extension for plaintiff to cure deficiencies *if elements of the report are found deficient*). However on appeal, neither party directly raises an issue regarding the order that Martin serve an amended report, and both parties seem to treat the amended report as the operative report. Nonetheless, even if Dr. Maxwell had obtained an order that the original report was deficient (either from the trial court or on appeal of a trial-court order overruling Dr. Maxwell's objections), the trial court would have been vested with discretion to order an amended report. *See id.* As explained below, we uphold the trial court's order that the amended report is sufficient. Consequently, we need not decide the effect, if any, of the court's ordering Martin to serve the amended report absent a ruling that the original report was deficient, and Martin has satisfied her statutory obligation at least via the amended report.

## A. Dr. Glass's Opinions

In the report, Dr. Glass explained his opinions regarding the applicable standard of care, Dr. Maxwell's breach thereof, and the causal connection between the breach and David's death. Dr. Glass stated that he relied on his own knowledge, training, and experience and reviewed the following to formulate his opinions: David's certificate of discharge from active duty; David's military records; medical records from Intracare Hospital concerning the relevant hospitalization; autopsy results; David's death certificate; Physicians' Desk Reference; Dr. Glass's interview of the medical examiner who performed the autopsy; and "Epocrates Online."

Relative to the standard of care, Dr. Glass opined that a reasonable and prudent psychiatrist should have recognized three factors pertinent to the circumstances of David's admission. First, there is a "very high probability" a "drug dependent" or "drug seeking" patient will "distort[] upwards" when reporting the amount of drugs, such as Benzodiazepine or narcotics, he is taking or falsely claim a dependency to obtain more of such drugs as part of a detoxification protocol. Second, a patient who is dependent on Benzodiazepine or narcotics rarely experiences "verbal" or "hyper-sexual" hallucinations (as David was experiencing when admitted); rather, such hallucinations are primarily symptomatic of Psychosis and occasionally PTSD, although a Benzodiazepine-dependent patient may experience "visual" hallucinations (which David also reported when admitted). Third, some medications in the protocol have known risks for negative interaction with some prescription medications that David said he was taking when admitted; in certain combinations, one medication may slow metabolism of another medication, effectively rendering the latter more potent or causing "dangerous toxic

---

As another preliminary matter, Martin requests that we uphold the trial court's order denying Dr. Maxwell's challenge to sufficiency of the amended report because her motion was not timely served on Martin. Because we uphold the trial court's finding that the report was sufficient, we need not address the issue regarding timeliness of service.

levels" in the blood.[6] For example, Dr. Glass stated that Trazodone is known to inhibit metabolism of Buproprion (a medication David said he was taking when admitted).

Dr. Glass opined that, in light of the above factors, a reasonable and prudent psychiatrist should not have immediately placed David on the protocol before confirming the claimed addiction; rather, the psychiatrist should have taken a more conservative approach of admitting and monitoring David without administering the protocol and placing him on one or more of the following while awaiting urinalysis results: (1) a medication containing a low dosage of Benzodiazepine, such as Ativan, to facilitate detoxification without threat of seizures if David were actually experiencing Benzodiazepine withdrawal and alleviate symptoms of narcotic withdrawal if he were actually experiencing such withdrawal; (2) Imodium for diarrhea; and/or (3) a low dosage of Catapres to ease muscle and bone pain of any narcotic withdrawal. Dr. Glass stated that there is a low risk of side effects from Ativan or Catapres and they generally do not interfere with the medications David said he was taking when admitted. Dr. Glass further opined that, although the protocol was negligently started, a reasonable and prudent psychiatrist should have at least discontinued the protocol once the urinalysis revealed David was not addicted to Benzodiazepine or narcotic opiates and treated him for Psychosis and/or PTSD.

With respect to the alleged breach, Dr. Glass acknowledged that Dr. Maxwell placed David on Ativan and Imodium (part of the approach that Dr. Glass described as "conservative" if it had been the only course of treatment exercised by Dr. Glass at the outset of admission) and prescribed an anti-psychotic medication. However, Dr. Glass opined that Dr. Maxwell breached the above-described standard of care by also

---

[6] Dr. Glass quoted Epocrates Online when he outlined potential negative interactions between various combinations of certain medications in the protocol and certain medications David was taking when admitted. Based on his recitation of excerpts from Epocrates Online, these combinations are apparently listed in that guide under various headings based on the degree of risk, such as "Avoid/Use Alternatives," "Monitor/Modify Tx," and "Caution Advised."

7

immediately administering the protocol and then failing to discontinue it when the urinalysis revealed David was not addicted to Benzodiazepine or narcotic opiates.

Relative to the causation element, Dr. Glass seemed to rely on several alleged facts: (1) the autopsy report showed the cause of death as "Polydrug toxicity due to Buproprion, Trazodone, and Valproic Acid"; (2) the medical examiner told Dr. Glass that the autopsy revealed a "lethal" level of Buproprion and "toxic" yet "therapeutic" levels of Trazodone and Valproic Acid in David's system; and (3) on the day after admission, Dr. Maxwell increased the dosage of Trazodone, as part of the protocol, to a higher dosage than David said he was taking when admitted.

Dr. Glass then opined that the protocol inhibited metabolism of Buproprion, causing it to reach the lethal level. At one point, Dr. Glass further opined that the lethal level of Buproprion "more likely than not, in reasonable medical probability, led to a decrease in [David's] respiratory effort and hypoventilation that resulted in his becoming increasingly hypoxic to the extent that he had a respiratory and subsequent cardiac arrest from which he could not recover and, more likely than not, caused his death." Dr. Glass seemed to use interchangeably the concepts of a lethal Buproprion level due to inhibiting effects of the protocol and "acute drug toxicity" because at another point, he opined "acute drug toxicity" led to the respiratory and cardiac arrest. Regardless, in sum, Dr. Glass concluded that David's death resulted from Dr. Maxwell's alleged negligence in prescribing the protocol and then failing to discontinue it when testing revealed David was not addicted to Benzodiazepine or opiate narcotics.

Dr. Glass's opinion on causation is unclear relative to his conclusion that the protocol inhibited metabolism of the Buproprion. At one point, Dr. Glass suggested the increased dosage of Trazodone alone could have caused the inhibited metabolism of Buproprion. At other points, he suggested that the increased dosage of Trazodone, along with one or more other medications in the protocol, caused the inhibited metabolism. At yet another point, his statement is unclear on whether other medications in the protocol also contributed to the inhibited metabolism. Nevertheless, as explained below, the

8

significant point relative to Dr. Maxwell's appellate complaint concerning the causation element is that an increased dosage of Trazodone was a common denominator in each of Dr. Glass's conclusions that the protocol inhibited metabolism of Buproprion, irrespective of whether he believed other medications in the protocol also contributed to this effect.[7]

## B. Dr. Maxwell's Contentions

### 1. Standard-of-Care and Breach Elements

On appeal, Dr. Maxwell advances only one reason that the report was purportedly inadequate with respect to the standard-of-care and breach elements. Specifically, Dr. Maxwell emphasizes that Dr. Glass opined David's death was caused by a negative interaction between Trazodone and Buproprion, but David was already taking both medications when admitted to the hospital. Thus, Dr. Maxwell argues that Dr. Glass's opinions were based on a false assumption: Dr. Maxwell's administration of the protocol and failure to discontinue it once the urinalysis revealed no addiction was the source of both Trazodone and Buproprion in David's system. Accordingly, Dr. Maxwell suggests that Dr. Glass failed to describe the standard of care applicable to a psychiatrist treating a patient who is already taking Trazodone and Buproprion; thus, he also failed to describe the manner in which Dr. Maxwell breached any such standard.

As discussed above, Dr. Glass opined that an *increased* dosage of Trazodone administered as part of the protocol inhibited metabolism of Buproprion. As we will further discuss, Dr. Maxwell contends on appeal, relative to the causation element, that Dr. Glass incorrectly concluded the Trazodone dosage was increased, although Dr. Maxwell did not raise this contention in her motion. Nonetheless, this contention, if properly raised, would pertain to sufficiency of Dr. Glass's causation opinion—not his standard-of-care and breach opinions.

---

[7] At least, as we construe the report, Dr. Glass did not clearly render any conclusion that one or more other medications in the protocol, *exclusive* of an increased dosage of Trazodone, inhibited metabolism of the Buproprion.

In particular, Dr. Glass's opinion that Dr. Maxwell was negligent by administering, and then failing to discontinue, the protocol was not based solely on a potential negative interaction between Trazodone and Buproprion. Rather, in addition to the advisory concerning the Trazodone-Buproprion combination, Dr. Glass outlined risks inherent in other combinations of various medications in the protocol and various medications David said he was taking when admitted. Accordingly, the trial court did not abuse its discretion by determining Dr. Glass provided a sufficient opinion on the standard-of-care and breach elements by articulating the *potential* for negative interaction between various medications in the protocol and various medications David said he was taking when admitted. Again, whether administration of the protocol could have actually caused David's death because of, more specifically, a negative interaction between Trazodone and Buproprion is a different issue, pertaining to whether Dr. Glass sufficiently described a causal relationship between the alleged breach and David's death.

### 2. Causation Element

Dr. Maxwell presents two appellate complaints relative to Dr. Glass's causation opinion. First, Dr. Maxwell contends that Dr. Glass incorrectly concluded the protocol included an *increased* Trazodone dosage. Specifically, in the report, Dr. Glass stated that David was taking 300 mg per day of Trazodone when admitted and the dosage initially given in the hospital was 100 mg per day. Dr. Glass then apparently quoted the hospital records when making the following statement:

> The day after admission, ". . . Trazodone was increased to 200mg hs, then may give 150 more if he wakes up." (Total Trazodone dose, 350 mg/day, or at least 50 mg/day more than he had been taking as an outpatient).

Dr. Maxwell suggests the instruction that an additional 150 mg "may" be given if David "wakes up," as noted in the hospital records, did not establish that an additional 150 mg was actually given, for a total of 350 mg per day, as Dr. Glass adds in the parenthetical; thus, the medical records indicate, at most, that the highest Trazodone dosage in the protocol (200 mg per day) was actually less than David was purportedly taking when admitted (300 mg per day). Second, Dr. Maxwell argues that, even if the Trazodone

10

dosage administered in the protocol was 50 mg higher than David was purportedly taking when admitted, Dr. Glass failed to explain how this increase, which Dr. Maxwell seems to characterize as negligible, inhibited metabolism of the Buproprion.

However, in her motion, Dr. Maxwell did not object to sufficiency of Dr. Glass's causation opinion on either of the two grounds raised on appeal. *See* Tex. Civ. Prac. & Rem. Code § 74.351(a) (requiring that defendant must "file and serve" objections to expert report); *Holland v. Hayden*, 901 S.W.2d 763, 765 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (recognizing that, in order to preserve error for appellate review, objection at trial must comport with complaint raised on appeal). In the motion, Dr. Maxwell did not mention Dr. Glass's assertion that the Trazodone dosage was increased, much less attack Dr. Glass's opinion on the ground he made an incorrect factual conclusion that the Trazodone dosage was increased. Moreover, in the motion, Dr. Maxwell did not argue that any increased Trazodone dosage of 50 mg per day was too insignificant a change to affect metabolism of Buproprion.

Rather, Dr. Maxwell objected that Dr. Glass's conclusion regarding the cause of death was unsupported by, and contrary to, the facts for the following reasons: (1) his opinion that David died from "acute drug toxicity which led to a decrease in his respiratory effort and hypoventilation that resulted in his becoming increasingly hypoxic to the extent that he had a respiratory and subsequent cardiac arrest from which he could not recover . . ." was pure conjecture because the autopsy report reflected David died of "Polydrug toxicity due to Buproprion, Trazodone, and Valproic Acid" and never mentioned respiratory or cardiac arrest; (2) none of the medications in the protocol, except Trazodone, were listed as a cause of death in the autopsy report; and (3) the autopsy report never mentioned that David's Buproprion level was "lethal," as asserted by Dr. Glass.

In the portion of her motion challenging Dr. Glass's causation opinion, Dr. Maxwell did mention twice that David was already taking Trazodone when admitted to the hospital. However, these assertions were effectively parentheticals to Dr. Maxwell's

11

above-cited contentions challenging Dr. Glass's conclusion regarding the cause of death. Specifically, when arguing that the cause of death was not respiratory and cardiac arrest, Dr. Maxwell asserted, "The autopsy report states clearly, and Dr. Glass quotes it in his report, that the cause of death was '[p]olydrug toxicity due to Buprorion, Trazodone, and Valproic Acid' . . . all of which [David] had been taking prior to his admission to [the hospital]." Subsequently, Dr. Maxwell asserted, "none of the medications in the detox protocol, except for the Trazodone [David] was taking before admission to [the hospital], are stated as the cause of death in the autopsy report."

To the extent these assertions may be construed as objections that the protocol could not have caused David's death because he was already taking Trazodone when admitted, Dr. Maxwell nonetheless did not apprise the trial court of the contention she asserts for the first time on appeal. In particular, Dr. Glass acknowledged that David was taking Trazodone when admitted. Integral to Dr. Glass's opinion was his conclusion that an *increased dosage* of Trazodone administered in the protocol caused, or contributed to, the inhibited metabolism of Buprorion. Therefore, Dr. Maxwell's note that David was already taking Trazodone when admitted did not constitute an attack on Dr. Glass's opinion that an increased Trazodone dosage inhibited metabolism of Buprorion.

To constitute a good-faith effort at providing a fair summary of an expert's opinions, the report must contain sufficient information to fulfill two purposes: (1) inform the defendant of the specific conduct the plaintiff has called into question; (2) and provide a basis for the trial court to conclude the claims have merit. *Palacios*, 46 S.W.3d at 875. With respect to the causation element, Dr. Maxwell contends the report failed to satisfy the second purpose; i.e., she acknowledges that Dr. Glass provided an opinion (the increased Trazodone dosage, alone or in conjunction with other medications in the protocol, inhibited metabolism of Buprorion) but argues his opinion is wrong because there was no such increased dosage or any increased dosage could not have caused, or contributed to, the inhibited metabolism.

12

We cannot hold the trial court abused its discretion by determining Dr. Glass adequately demonstrated that Martin's claims have merit despite the purported deficiencies in his report cited by Dr. Maxwell on appeal when Dr. Maxwell did not specifically inform the court of those deficiencies. Accordingly, we uphold the trial court's ruling that Dr. Glass sufficiently provided an opinion on the causation element. *See Ibrahim v. Gildbride*, No. 14-09-00938-CV, 2010 WL 5064430, at *11 n.2 (Tex. App.—Houston [14th Dist.] Dec. 9, 2010, no pet.) (mem. op.) (refusing to consider one ground for defendant's appellate challenge to causation opinion in expert report served in health-care-liability claim because ground was not presented to trial court in defendant's motion); *Williams v. Mora*, 264 S.W.3d 888, 890–91 (Tex. App.—Waco 2008, no pet.) (considering only defendant's appellate contention that health-care-liability expert report was speculative based on expert's using "could have" in two places to describe causation opinion because such contention was defendant's only timely objection in trial court; and holding defendant waived other complaints raised on appeal—that report was conclusory and failed to identify "deviation from the standard of care and negligence" and provide sufficient information on causation).

We overrule Dr. Maxwell's sole issue and affirm the trial court's order denying Dr. Maxwell's motion challenging sufficiency of Martin's amended expert report.


/s/    Charles W. Seymore
       Justice


Panel consists of Justices Frost, Seymore, and Jamison.