

## NUMBER 13-09-00456-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

HEALTH CARE UNLIMITED, INC. AND
HEALTH CARE UNLIMITED-MCALLEN,                    Appellants,

v.

SERVANDO VILLARREAL,                                      Appellee.

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Benavides
### Memorandum Opinion by Justice Rodriguez

Appellants Health Care Unlimited, Inc. and Health Care Unlimited–McAllen

(collectively HCU) complain of the trial court's denial of their motion to dismiss appellee

Servando Villarreal's health care liability claim for failure to serve an adequate expert

report, as required by section 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)-(b) (Vernon Supp. 2009). By one issue, HCU complains that the trial court abused its discretion by failing to dismiss Villarreal's claims because his expert report did not demonstrate that the expert is qualified, identify the applicable standard of care, or explain the causal connection between the alleged breach and Villarreal's injury. We affirm.

## I. BACKGROUND

In late July 2005, Villarreal underwent spinal fusion surgery to repair a fractured lumbar vertebra in his back. Over the course of the next year, Villarreal suffered complications, including chronic refractory osteomyelitis—a recurring severe abscess—on what Villarreal's expert report describes as his left flank.[1] Villarreal was hospitalized once in January 2006, twice in March 2006, and once in August 2006, for treatment of the abscess; each time, the abscess was surgically drained, and at the March and August surgeries, the wound was fitted with a vacuum assisted closure (VAC) sponge device to promote healing. After discharge from his August 2006 hospital stay, Villarreal began receiving home health care from HCU, which continued the use of the VAC sponge device in its treatment of Villarreal.

In June 2007, Villarreal was again admitted to the hospital because of continued drainage from the same wound in his left flank; doctors at the hospital determined that the wound was infected. During surgery to incise and drain the wound, doctors discovered a

---

[1]Osteomyelitis is defined as an "[i]nflammation of the bone marrow caused by bacteria, such as staphylococci, that gains entry through a wound or injury." IDA G. DOX ET AL., ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY O21 (1997). Flank is defined as the "side of the body between the ribs and the pelvis." *Id.* at F21. Villarreal's expert report refers to the site of his infection interchangeably as his left flank or hip.

2

foreign body in the wound, which was eventually determined to be a sponge from the VAC device. The doctor who performed the surgery noted that the sponge had been left in the wound so long that tissue had grown into the sponge. In September 2007, Villarreal underwent another surgery to remove more sponge material from the same wound.

On October 10, 2008, Villarreal sued HCU,[2] alleging that it had negligently left a sponge from the VAC device in Villarreal's wound causing extended hospitalization and multiple surgeries to remove the sponge. Villarreal prayed for damages in the form of past and future medical expenses, past and future lost wages, past and future pain and mental anguish, disfigurement, loss of enjoyment of life, and any other damages allowed by law. Villarreal served an expert report authored by Keith Miller, M.D. on January 29, 2009. HCU objected to the adequacy of the report and filed a motion to dismiss Villarreal's claims on the grounds that Dr. Miller was unqualified as an expert, failed to identify the applicable standard of care, and failed to explain the causal relationship between HCU's alleged breach and Villarreal's injuries. *See id.* § 74.351(a)-(b), (r)(6). On April 13, 2009, the trial court found the report deficient but granted Villarreal a thirty-day extension to submit a sufficient amended report. *See id.* § 74.351(c). On May 11, 2009, Dr. Miller submitted an amended report, to which HCU filed further objections. After a hearing on HCU's objections and motion to dismiss, the trial court overruled HCU's objections to the report and denied its motion to dismiss. This interlocutory appeal ensued. *See id.* § 51.014(a)(9) (Vernon 2008) (authorizing an interlocutory appeal of the denial of a motion to dismiss filed under section 74.351(b)).

---

[2]Villarreal also sued Drs. Noel Oliveira and Raul Barreda, Doctors Hospital at Renaissance Wound Care Center, Edinburg Regional Medical Center, Rehab Center at Renaissance Doctors Hospital, and Doctors Hospital, Ltd. However, none of the foregoing are parties to this appeal.

3

## II. Standard of Review and Applicable Law

We review a trial court's decision on a motion to dismiss under section 74.351 of the civil practice and remedies code for abuse of discretion. *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). The trial court abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003).

Under section 74.351 of the Texas Civil Practice and Remedies Code, a claimant must "serve on each party or the party's attorney" an expert report and curriculum vitae "not later than the 120th day after the date the original petition was filed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). An expert report is "a written report by an expert that provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6).

In our review of the expert report, we are limited to the four corners of the report in determining whether the report manifests a good faith effort to comply with the statutory definition of an expert report. *Palacios*, 46 S.W.3d at 878; *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*) (requiring that the trial court "grant a motion challenging the adequacy of the expert report only if appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statutory definition). The report "need not marshal all the plaintiff's proof." *Palacios*, 46 S.W.3d at 878;

4

*Jernigan*, 195 S.W.3d at 93. If the expert report puts the defendant on notice of the specific conduct complained of and provides the trial court a basis on which to conclude the claims have merit, the report represents a good-faith effort to comply with the statute. *Palacios*, 46 S.W.3d at 879.

## III. DISCUSSION

By its sole issue, HCU argues that the trial court erred in denying its motion to dismiss Villarreal's claims because his expert report was inadequate under section 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)-(b).

## A. Qualifications of Dr. Miller

First, HCU complains that Dr. Miller's amended report fails to demonstrate that he is qualified to be an expert in Villarreal's case. HCU contends, in particular, that Dr. Miller's certification in family medicine does not qualify him to render an opinion regarding chronic wound care management, the type of care HCU provided to Villarreal.

In a suit alleging health care liability against a health care provider,[3] a person qualifies as an expert witness if the person:

(1)    is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2)    has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

---

[3]It is undisputed that HCU is a health care provider subject to chapter 74 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(12)(A) (Vernon 2005).

>    (3)    is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b)(1)-(3) (Vernon 2005). In determining whether a witness is qualified on the basis of training or experience, we consider whether, at the time the claim arose or at the time the testimony is given, the witness:

>    (1)    is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

>    (2)    is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(c)(1)-(2); *see also Polone v. Shearer*, 287 S.W.3d 229, 238 (Tex. App.–Fort Worth 2009, no pet.). Chapter 74 does not require that the expert be a specialist in the exact same field as the health care provider. *See Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003). Our analysis of the qualifications of an expert under section 74.351 is limited to the four corners of the expert's report and curriculum vitae. *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 813 (Tex. App.–Houston [14th Dist.] 2008, no pet.).

Our review of Dr. Miller's expert report and curriculum vitae reveals that he is a medical doctor licensed in the State of Texas and board-certified in family medicine who has been practicing for over twenty years. Dr. Miller served as a commissioner on the Texas State Board of Medical Examiners for nearly four years and as a faculty member at both the University of Texas Health Science Center Family Practice Residency Program and the Panola College School of Licensed Vocational and Registered Nursing. He also worked for two years as the chief of staff and for ten years as the director of emergency services at the Shelby Regional Medical Center in Center, Texas. Dr. Miller's expert report

6

provides the following with regard to his qualifications that is specifically relevant to this case:

> I am a medical doctor currently licensed to practice in the state of Texas. I have been a licensed medical doctor since 1985, have been practicing medicine continuously since then, including during the time of this claim, and as part of my practice, have been, and am currently involved in the diagnosis, care, and treatment of many patients similar to Mr. Servando Villarreal. I am familiar with the diagnosis and treatment of patients with conditions and their complications similar to those experienced by Mr. Servando Villarreal. I am familiar with the standards of care applicable to physicians, nurses, hospitals, emergency departments, wound care centers, and home health care agencies, which treat patients with conditions similar to Mr. Servando Villarreal. . . . In addition, I interact with nursing and other staff at hospitals, clinics, emergency rooms, wound care centers, and home health care agencies, on a daily basis, and I am familiar with the standard procedures for physicians and nurses taking care of patients like Mr. Servando Villarreal. I am familiar with these standard procedures . . . because I have treated many patients with these conditions.

After summarizing the facts of Villarreal's treatment, Dr. Miller further described his qualifications as follows:

> I am familiar with the accepted medical standards of care applicable to the assessment, diagnosis, and treatment of patients with wound infections, and their causes, as well as their complications . . . . I know this on the basis of my education, knowledge, training, and direct experience.
>
> I acquired this education, knowledge, training, and direct experience through:
>
> 1) my attending, and successfully completing, medical school classes, and residency, that teach the evaluation, diagnosis, care and treatment of patients with . . . wound infections;
>
> 2) practical experience of diagnosing and treating patients with . . . wound infections;
>
> 3) discussions with colleagues at yearly conferences, seminars and meetings;
>
> 4) study of technical works routinely published in textbooks, journals and literature concerning the evaluation, diagnosis, care and treatment of patients with . . . wound infections;

7

5) my routine discussions and consultations with other physicians who also treat patients with the same or similar conditions as Mr. Servando Villarreal and wound infections;

6) my routine and regular contact with hospital nurses, staff and residents who take care of patients with the same or similar conditions as Mr. Servando Villarreal and wound infections;

7) my knowledge and experience giving lectures and in-service conferences to nurses and staff;

8) my experience serving on numerous hospital committees;

9) my observation of nurses and nurse conduct, supervising residents, and instructing nurses and residents in the evaluation, diagnosis, care and treatment of patients the same as, or similar to, Mr. Servando Villarreal and wound infections; and

10) my past use of wound VAC sponge devices on patients similar to Mr. Servando Villarreal . . . .

. . . .

I have had training and experience concerning providing home health care for patients receiving wound treatment, generally, and wound VAC therapy specifically, to patients such as Mr. Villarreal . . . .

HCU argues that Dr. Miller's statements regarding his qualifications are conclusory and unsupported by the facts. We disagree. The information provided in Dr. Miller's report shows that he has been continuously practicing in a "field of practice that involves the same type of care or treatment as that delivered" by HCU, wound treatment and maintenance. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1); *Roberts*, 111 S.W.3d at 121 (holding that an expert need not be a specialist in the exact field so long as he has knowledge, skills, expertise, and training regarding the specific issue in the case); *see also Polone*, 287 S.W.3d at 238-39 (holding that a doctor is qualified where report states that he has experience treating other patients with conditions similar to those of the plaintiff).

8

Furthermore, Dr. Miller states in his report that, through his education and direct experience, he has knowledge of the standards of care applicable to HCU in their treatment of patients with wounds like Villarreal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2); *see also Bennett*, 256 S.W.3d at 814 (affirming the denial of a health care provider's motion to dismiss because, in part, the doctor was qualified to author the report based on his experience working with and instructing nurses and other staff who care for patients with bed sores). Finally, Dr. Miller is licensed to practice in the state of Texas and has been actively practicing medicine that is relevant to Villarreal's claim, which demonstrates that he is "qualified on the basis of training or experience to offer an expert opinion regarding" the standard of care applicable to this case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(3), (c)(1)-(2). We therefore conclude that Dr. Miller is qualified to provide an expert report in Villarreal's case.

### B. Standard of Care and Breach

Second, HCU complains that Dr. Miller's amended report fails to set forth the applicable standard of care. Specifically, HCU contends that "Dr. Miller wholly fails to provide a fair summary of the care which was expected or specify what [HCU] should have done or indicate what actions taken by [HCU] deviated from the applicable standard of care." *See id.* § 74.351(r)(6).

In his amended report, Dr. Miller opines that the applicable standard of care requires that HCU "do what a reasonable home health care agency would have done under the same or similar circumstances, or not do what a reasonable home health care agency would not have done under the same or similar circumstances." Dr. Miller emphasizes that the staff of HCU "were responsible for assessing, removing, and/or changing this patient's

9

wound VAC sponge device."  The amended expert report then sets forth the standard of care as follows:

> The accepted standards of medical care applicable to . . . [HCU] in [its] care of Mr. Servando Villarreal . . . include, but are not limited to, the following standards:
>
> 1) This is a device which is placed routinely and as a matter of course by the nurses and staff of facilities such as . . . [HCU], and this same device should have been removed and/or changed by . . . the nurses and staffs.
>
> . . . .
>
> 3)  The standard of care required that, during the time they were caring for Mr. Servando Villarreal in 2006 and 2007, [HCU] . . . should have discovered the presence of a foreign body in the left flank wound of this patient and alerted physicians for appropriate treatment.  The staff of [HCU] . . . should have assessed Mr. Villarreal on a daily basis and make [sic] sure that no wound VAC device remain [sic] in this patient's hip for more than two days.  Since it was the staff of this facility that was treating Mr. Villarreal for his wound, it was their obligation to assess the wound at least every two days.
>
> 4) The standard of care required that during the time they were caring for Mr. Servando Villarreal in 2006 and 2007 . . . [HCU] . . . should have properly cleaned the wound in Mr. Villarreal's left flank and properly removed and/or replaced the wound VAC sponge device at least every two days.  Proper technique in removing and/or replacing the wound VAC sponge device, [sic] would have involved thoroughly exploring the full extent of the wound at each removal and/or replacement.  This would ensure that any old sponge devices or portions of the same would always be found and removed and no foreign bodies would be left in this patient's wound.  The nurses and staffs of . . . [HCU] should have documented in the medical record that this wound had indeed been thoroughly explored, cleaned, and any old sponge device of [sic] parts thereof, [sic] had been completely removed prior to replacing any new sponge devices into the wound.
>
> . . . .
>
> The breaches and violations of the standards of care are as follows:
>
> . . . .
>
> 2) [HCU] . . . failed the standard of care which required that . . . [HCU] should have discovered the presence of a foreign body in the left flank

wound of this patient and alerted his physicians for appropriate treatment. The staff . . . failed to assess Mr. Villarreal on a daily basis and make sure that no wound VAC device remained in this patient's hip for more than two days . . . .

A "fair summary" of the applicable standard of care and breach identifies the type of care expected but not rendered and that is precisely the information that Dr. Miller's amended report provides. *See Palacios*, 46 S.W.3d at 880. He explains the specific tasks and responsibilities required of HCU and notes that HCU failed to perform those tasks and responsibilities. We conclude that Dr. Miller's report sufficiently sets forth the standard of care and breach elements required of expert reports under section 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

## C. Causation

Third, HCU complains that Dr. Miller's amended report did not adequately identify the causal connection between HCU's alleged breach and Villarreal's injuries. HCU notes that Villarreal was hospitalized four times in 2006 for treatment of the abscess prior to the time HCU began caring for Villarreal in August 2006. Emphasizing this fact, HCU argues that Dr. Miller's statements regarding causation are conclusory, fail to rule out conditions existing before HCU's treatment of Villarreal, and fail to differentiate between the alleged negligence of HCU and the potentially negligent acts of other health care providers who treated Villarreal before August 2006. Our review of Dr. Miller's report indicates otherwise.

In his report, Dr. Miller describes Villarreal's injuries as they appeared in June 2007:

Mr. Villarreal was admitted . . . . from 6-18-07 through 6-26-07 for continued drainage from the same wound from his left flank from which he had experienced trouble . . . . Upon admission, this patient was diagnosed with osteomyelitis of his lumbar spine with infection from multiple organisms. Mr. Villarreal was taken to surgery for incision and drainage of the this wound . . . . [The surgeon] immediately discovered a foreign body in this wound which was determined to be an old wound VAC sponge left in place. [The

11

surgeon] noted that the sponge had been in place for so long that it ". . . appeared to have tissue grown into it".

> [The surgeon] sent the removed sponge to pathology for analysis which confirmed that the object was a ". . . wound vac sponge showing reactive fibrosis and granulation tissue with foreign body giant cell reaction . . . negative for significant acute inflammation".

> On 9-25-07, Mr. Villarreal was admitted . . . with continued drainage from his left flank wound. At this admission, he was taken to surgery . . . [which uncovered] more sponge material in the wound. . . .

Dr. Miller opines that during the time it was caring for Villarreal in 2006 and 2007, HCU "should have discovered the presence of a foreign body" in Villarreal's wound and alerted his doctors for treatment. Dr. Miller further notes that it was HCU's obligation to "assess the wound on a daily basis" and "change or remove any wound VAC device at least every two days." He then states that HCU staff failed to perform these obligations and specifically concludes that:

> Because this foreign body was left in Mr. Villarreal's hip too long, it caused severe infection which spread all the way into this patient's bones and spine, resulting in a severe bone infection or osteomyelitis, neither of which would have occurred had the wound VAC device been timely discovered and removed. Had [HCU] . . . cared for Mr. Servando Villarreal according to the acceptable standards of care, then more likely than not and to a reasonable degree of medical certainty, the foreign body in this patient's flank would have been found and removed in a timely manner and Mr. Villarreal would not have undergone prolonged pain and suffering, multiple hospitalizations and surgical procedures, as well as overall worsening of his condition, pain mental anguish, and loss of dignity.

To comply with section 74.351's requirements, an expert report must include an explanation of the causal connection between a defendant health care provider's departure from the standard of care and the injury, harm, and/or damages claimed by the plaintiff. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). This requirement is met if the report explains the basis of the expert's statements and links his conclusions to the facts. *See*

12

*Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). By explaining how the sponge negligently left in Villarreal's wound by HCU caused a severe infection that spread all the way to his bones and spine necessitating multiple painful surgeries, Dr. Miller has done just that. In other words, the expert report demonstrated the basis of Dr. Miller's statement linking HCU's breach to Villarreal's infected abscess, resulting 2007 hospitalizations, and painful recovery. *See id.*

Based on the foregoing, we cannot conclude that the trial court abused its discretion in denying HCU's motion to dismiss. *See Jernigan*, 195 S.W.3d at 93; *Palacios*, 46 S.W.3d at 878. Looking only within the four corners of Dr. Miller's amended report, we hold that the report adequately identified Dr. Miller's qualifications and the applicable standard of care and HCU's breach and explained how, in Dr. Miller's opinion, the breach caused Villarreal's injuries. *See Palacios*, 46 S.W.3d at 878. The report was a good faith effort to comply with the statute because it put HCU on notice of the specific conduct complained of and provided the trial court a basis on which to conclude the claims have merit. *See id.* at 879; TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*). HCU's sole issue is overruled.

## IV. CONCLUSION

The order of the trial court is affirmed.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 11th
day of February, 2010.

13