**Reversed and Remanded and Memorandum Opinion filed December 20, 2011.**



In The

# 𝕱𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝕮𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-11-00242-CV

**NICK GIANNONE, M.D., Appellant**

**V.**

**MELINDA BURCH AND MARTIN TRAINER, AS SURVIVING CHILDREN OF MARYLYN KAY ANDREWS, DECEASED AND AS REPRESENTATIVES OF THE ESTATE OF MARYLYN KAY ANDREWS, Appellees**

**On Appeal from the 239th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 57368**

## M E M O R A N D U M   O P I N I O N

Appellees, Melinda Burch and Martin Trainer, as surviving children of Marylyn Kay Andrews, deceased and as representatives of the estate of Marylyn Kay Andrews filed a health care liability suit against appellant, Nick Giannone, M.D. In three issues, Dr. Giannone contends the trial court erred by denying his motion to dismiss for failure to serve an adequate expert report. We reverse and remand.

# I. BACKGROUND

On July 12, 2009, at approximately 10:30 p.m., Marylyn Kay Andrews was treated at the Angleton Danbury Medical Center emergency room. Andrews complained of severe shortness of breath, fever, and a history of chronic obstructive pulmonary disease ("COPD"). The first emergency room physician treated Andrews with supplemental oxygen, Albuterol, and antibiotics.

At midnight, there was a shift change, and Dr. Giannone assumed care of Andrews. He diagnosed chronic bronchitis, "acute exacerbation." He also ordered an EKG. After receiving the EKG results, Dr. Giannone cleared Andrews for discharge. Later that morning, a radiologist reviewed Andrews's films and discovered edema. At approximately 11:41 a.m., someone called Andrews and advised her regarding this finding. Andrews told the caller that "[s]he was doing okay." According to appellees, Andrews suffocated shortly thereafter.

Appellees filed a health care liability suit against Dr. Giannone, contending his emergency room treatment of Andrews was below the standard of care as follows:

1.  In failing to perform an adequate physical exam before dismissing [Andrews] from his care;

2.  In failing to review and consider [Andrews's] records before dismissing [Andrews] from his care;

3.  In failing to specifically perform an adequate work up for cardiac problems despite [Andrews's] multiple risk factors;

4.  In specifically failing to prescribe antibiotics upon discharging [Andrews];

5.  In specifically failing to refer [Andrews] to immediate care by a physician at discharge;

6.  In specifically failing to consider cardiomegally and CHF;

7.  In failing to follow up [with] the patient with a call to determine [her] ongoing condition; and

8.  In more areas to be determined as discovery continues.

Pursuant to section 74.351 of the Civil Practice and Remedies Code,[1] appellees timely served an expert report by Karlan Downing, M.D. Dr. Giannone filed a motion to dismiss, contending the report did not comport with the statute. In response, appellees timely served Dr. Downing's amended expert report.[2] Dr. Giannone filed a second motion to dismiss which was denied by the trial court.

In her amended report, Dr. Downing referred to her attached curriculum vitae ("CV") with the following attribution: "As indicated in my CV, I have a great deal of experience practicing medicine in rural emergent care units and continue to practice emergency room medicine." Dr. Downing outlined the following education and experience in her CV:

- 1976-1998: among other functions, "[g]eneral surgery backup call for ER when [general surgeon] was not available";

- 1978-1998: "ER medicine averaging 24-48 hrs a week (Excluding 'on call' time)";

- 1998-2003: "Full time practitioner ER Medicine" for several hospitals and ER groups;

- 2003-2008: among other functions, "[m]edical director of the ER [of Falls Community Rural Health Clinic] providing active supervision and quality assurance functions";

- 2007-present: "ER staff" part time for Lakeside Hospital;

- 2008-present: medical director for emergency room at East Texas Medical Center;

- Among other offices, "Director of the ER" for Lavaca Medical Center;

- "ATLS [advanced trauma life support], ACLS [advanced cardiac life support], and PALS [pediatric advanced life support] certification current";[3] and

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2011) (requiring health care liability claimant to serve an expert report on all parties not later than 120th day after filing the original petition).

[2] The trial court never ruled on the adequacy of the original report.

[3] Dr. Giannone argues these certifications should not be considered because Dr. Downing did not explain the meaning of the acronyms. For purposes of this opinion, we presume ATLS, ACLS, and PALS are widely known certifications in the medical community.

3

- Board certified in emergency medicine through AAPS (Dr. Downing did not specify when she received the certification).[4]

In her amended report, Dr. Downing offered the following opinions:

3. I have reviewed the records you provided on Marylyn Andrews D/B 6-17-43 from Angleton Danbury Medical Center. The records reflect that Ms. Andrews was admitted to the ER . . . on July 12, 2009 and I have found the following discrepancies which I feel violate the standard of care in this case which involves a person with COPD being released from a medical center without proper evaluation or follow up care.

4. In light of the patient's history, no significant work up for cardiac problems other than an EKG was ordered by the attending emergency room physician, Dr. Giannone, despite multiple risk factors. No lab work such as Beta NP was ordered by Dr. Giannone to assess for CHF despite risk factors of age and symptoms. The failure of Dr. Giannone to perform a significant work up was below the standard of care for a medical center in Texas and such failure contributed to cause the patient's untimely death.

5. There is no documentation that Dr. Giannone was aware of elevated temp of 102.1 as charted on arrival by the nursing staff. Nursing staff notes temp was still slightly elevated at 99.5 on discharge, and assuming Dr. Giannone knew of these temperatures and still released Mrs. Andrews, it would be far below the standard of care for emergency room physicians in Texas and was a contributing cause [of] the patient's untimely death.

6. Levaquin was ordered by Dr. Gionnone [sic] and given to the patient by IV, but no RX was given for antibiotics . . . for follow up after release and she was not told to see a doctor the next day. The failure of Dr. Gionnone [sic] to give an antibiotic and refer to a physician to be seen the next day was below the standard of medical care in Texas and contributed to the patient's untimely death.

7. Rx for Robitussin AC was faxed to the pharmacy by Dr. Gionnone [sic], but Dr. Gionnone [sic] did not order antibiotics to follow the levaquin despite elevated temps and a diagnosis of bronchitis. This was certainly a significant factor in her subsequent sepsis, was below the standard of care in Texas and contributed to cause her untimely death.

---

[4] Dr. Giannone argues that little or no weight should be given to Dr. Downing's board certification through AAPS because the Texas Medical Board recently ruled that AAPS is no longer allowed to confer board certified status. However, Dr. Giannone also notes that physicians who were board certified through AAPS before September 1, 2010 are excluded from this ruling. Accordingly, we will consider Dr. Downing's board certification.

4

8. Cardiomegally and early CHF were not appreciated by Dr. Gionnone [sic] on the CXR. This failure to appreciate the cardiomegally was below the standard of care and contributed to the patient's untimely death.

9. Although the patient was called on 7/13/2009 at 11:41 a.m. per the record by Elizabeth Johnson and "She said she was doing okay . . ." there is no indication that a physician spoke with the patient and no documentation of status of Ms. Johnson. The failure of Dr. Gionnone [sic] to make certain that a qualified physician follow up with appropriate questions on the day after the premature release was below the standard of medical care in Texas and contributed to cause the patient's untimely death.

10. For all of the above stated reasons, individually and collectively, it is my medical opinion, based on documentation provided, that the standard of care was not met by Dr. Gionnone [sic] and in my medical opinion the above failures were responsible for the demise of Marylyn Andrews.

## II. ANALYSIS

In three issues, Dr. Giannone contends the trial court erred by denying his motion to dismiss because (1) Dr. Downing's qualifications to offer an expert opinion regarding Dr. Giannone's actions are not shown within the four corners of the expert report, (2) Dr. Downing did not adequately identify the relevant standards of care, and (3) Dr. Downing did not adequately explain how Dr. Giannone's alleged breach caused harm to Andrews.

We employ an abuse-of-discretion standard in reviewing a trial court's determinations regarding an expert's qualifications to render an opinion in a health care liability suit and adequacy of the expert's report. *Amer. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Broders*, 924 S.W.2d at 151; *Bennett*, 256 S.W.3d at 811. The plaintiff must show the expert is qualified and the expert report satisfies the statutory requirements. *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

5

## A. Dr. Downing's Qualifications

In his first issue, Dr. Giannone contends appellees did not establish that Dr. Downing is qualified to opine regarding Dr. Giannone's emergency room treatment of Andrews.

For the author of an expert report to satisfy section 74.351, she must be qualified to render opinions regarding the medical care which is the subject of the claim against the defendant. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5). Analysis of expert qualifications under section 74.351 is limited to the four corners of the report and the expert's CV. *Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex. App.— Houston [14th Dist.] 2009, no pet.); *see Palacios*, 46 S.W.3d at 878. To be qualified, the expert must satisfy the requirements of section 74.401. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A). Under section 74.401, the expert must be a physician who:

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* § 74.401(a) (West 2011). "Practicing medicine" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians. *Id.* § 74.401(b). In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

> (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

> (2) is actively practicing medicine in rendering medical care services relevant to the claim.

*Id.* § 74.401(c).

In his motion to dismiss, Dr. Giannone argued, "Dr. Downing, in her affidavit, fails to indicate whether she has knowledge of the accepted and applicable standard of care and fails to indicate whether she is qualified to render an opinion of the applicable standard of care based on her training or experience." On appeal, Dr. Giannone contends Dr. Downing's description of her credentials is vague. Dr. Giannone argues, "[t]here is no indication . . . [she] has ever seen this kind of case, or even related cases," and [t]here is no indication of what kind of role she fills in the ER, save that she sometimes worked as a surgeon as late as 1998." Dr. Giannone argues it is indiscernible whether Dr. Downing's experience in "ER medicine" means she worked as a trauma or triage physician, emergency surgeon, hospitalist, or in some other capacity. Dr. Giannone also contends,

> At a minimum an expert must at least say they are familiar with the standard of care for a specific issue, . . . but here we are not given even that. There is no indication that Dr. Downing is familiar with the specific situation and her opinions are based on those experiences or if she is relying on evidence of a more general nature dealing with breaches of a basic standard of care.

We construe the above language as an argument that appellees failed to demonstrate Dr. Downing satisfies the qualification requirements prescribed in subsections (a)(2) and (a)(3) of section 74.401.

In her report, Dr. Downing indicated that she reviewed relevant medical records and stated, "I am competent to testify regarding the matters stated herein." Dr. Downing's CV demonstrates that she is board certified in emergency medicine, practiced "ER medicine" for over twenty-five years, and continues to practice emergency room medicine as medical director for the emergency room of East Texas Medical Center. We disagree with Dr. Giannone's contention that "ER medicine" is a vague term because it

refers to a multitude of medical disciplines. Generally, "ER medicine" logically refers to the medical treatment of patients who present at an emergency room.[5]

We also conclude the trial court did not abuse its discretion by determining Dr. Downing's board certification in emergency medicine and substantial experience and continuing practice in emergency room medicine established that she is qualified on the basis of training or experience to opine regarding the applicable standards of care. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(3), (c); *see also Pokluda*, 283 S.W.3d at 120 ("The statute provides that a witness is qualified if he is board certified and 'is actively practicing medicine in rendering medical care services relevant to the claim.' [The expert witness in this case] satisfies this requirement. . . . The statute does not require an expert to have performed a specific procedure in order to opine." (citations omitted)); *Thomas v. Alford*, 230 S.W.3d 853, 857–58 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("Because the claim in this case relates to the diagnosis and treatment of cancer, and Grossbard is board certified and practices in the field of oncology, he is qualified to offer an opinion on the standard of care for the diagnosis and treatment of cancer.").

Nevertheless, we agree appellees failed to establish that Dr. Downing has knowledge of the accepted standards of medical care involved in this claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(2). The basis of appellees' claim is that Dr. Giannone caused Andrews's death by breaching the standards of care applicable to an emergency room physician treating a patient with conditions similar to those suffered by Andrews. In her report, Dr. Downing did not demonstrate that she has knowledge of, or is familiar with, the accepted standards of care for treating patients who present at an emergency room with conditions similar to those suffered by Andrews. *See, e.g.*, *McKowen v. Ragston*, 263 S.W.3d 157, 162 (Tex. App.—Houston [1st Dist.] 2007, no

---

[5] *See* Taber's Cyclopedic Medical Dictionary (18th ed. 1997) (defining "emergency medicine" as "Branch of medicine specializing in emergency care of the acutely ill or injured," and explaining that "emergency room" is synonymous with "Emergency Department," which is defined as "The portion of hospital that treats patients experiencing an emergency").

8

pet.) (concluding expert demonstrated knowledge of accepted standards of care by stating he was board certified in infectious diseases, actively practicing medicine in the area of infectious diseases, has treated patients infected with the same disease suffered by the decedent, and has knowledge of the standards of care related to these infections based on his experience); *Burrell*, 230 S.W.3d at 760 (concluding expert satisfied requirement that he have knowledge of accepted standard of care by stating he was familiar with applicable standards and clearly explained those standards); *In re Windisch*, 138 S.W.3d 507, 514 (Tex. App.—Amarillo 2004, orig. proceeding) (concluding expert's statements insufficient to demonstrate he had adequate knowledge of the accepted standards of care for the relevant procedure).

Accordingly, it is indeterminable from the four corners of Dr. Downing's report whether she has the requisite knowledge of the applicable standards of care. We conclude that the trial court erred by finding the report satisfies the requirements of subsection (a)(2) of section 74.401. Issue one is sustained.

## B. Standards of Care, Breach, and Causal Link

We next address Dr. Giannone's second and third issues, in which he contends that Dr. Downing did not provide an adequate opinion regarding applicable standards of care, Dr. Giannone's alleged breach of those standards, and the causal link between each alleged breach and Andrews's death. In determining whether Dr. Downing's report complies with the statute, we decide whether she adequately addressed the allegations in Plaintiff's Original Petition which generally pertain to standards of care for an emergency room physician.

An "expert report" is defined as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician . . . failed to meet the standards, and the causal relationship between the failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). The trial court should grant a motion challenging the adequacy of an expert report only if it appears to

the court, after a hearing, that the report does not represent an objective good faith effort to comply with the statutory definition of an expert report. *Id.* § 74.351(l).

To provide a fair summary of the applicable standard of care, an expert must describe the care that was expected but not given. *Palacios*, 46 S.W.3d at 880. A court cannot determine whether the standard of care has been breached absent specific information regarding what should have been done differently. *Id.* Additionally, an expert does not fulfill the statutory requirements by generally opining that the defendant's breach caused an injury. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). Such a statement is conclusory and provides merely the expert's *ipse dixit*. *See id.* at 539–40. Instead, the expert must explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented. *Id.* Although "magical words" are not required, mere invocation of the phrase "medical probability" does not insure that the report will be found adequate. *Id.* at 540.

As noted above, Dr. Downing provided the following opinions in her report:

4. In light of the patient's history, no significant work up for cardiac problems other than an EKG was ordered by the attending emergency room physician, Dr. Giannone, despite multiple risk factors. No lab work such as Beta NP was ordered by Dr. Giannone to assess for CHF despite risk factors of age and symptoms. The failure of Dr. Giannone to perform a significant work up was below the standard of care for a medical center in Texas and such failure contributed to cause the patient's untimely death.

5. There is no documentation that Dr. Giannone was aware of elevated temp of 102.1 as charted on arrival by the nursing staff. Nursing staff notes temp was still slightly elevated at 99.5 on discharge, and assuming Dr. Giannone knew of these temperatures and still released Mrs. Andrews, it would be far below the standard of care for emergency room physicians in Texas and was a contributing cause [of] the patient's untimely death.

6. Levaquin was ordered by Dr. Gionnone [sic] and given to the patient by IV, but no RX was given for antibiotics . . . for follow up after release and she was not told to see a doctor the next day. The failure of Dr. Gionnone [sic] to give an antibiotic and refer to a physician to be seen the next day was below the standard of medical care in Texas and contributed to the patient's untimely death.

10

7. Rx for Robitussin AC was faxed to the pharmacy by Dr. Gionnone [sic], but Dr. Gionnone [sic] did not order antibiotics to follow the levaquin despite elevated temps and a diagnosis of bronchitis. This was certainly a significant factor in her subsequent sepsis, was below the standard of care in Texas and contributed to cause her untimely death.

8. Cardiomegally and early CHF were not appreciated by Dr. Gionnone [sic] on the CXR. This failure to appreciate the cardiomegally was below the standard of care and contributed to the patient's untimely death.

9. Although the patient was called on 7/13/2009 at 11:41 a.m. per the record by Elizabeth Johnson and "She said she was doing okay . . ." there is no indication that a physician spoke with the patient and no documentation of status of Ms. Johnson. The failure of Dr. Gionnone [sic] to make certain that a qualified physician follow up with appropriate questions on the day after the premature release was below the standard of medical care in Texas and contributed to cause the patient's untimely death.

We conclude Dr. Downing did not provide a fair summary of the accepted standards of care applicable in this situation. First, Dr. Downing stated that Dr. Giannone breached a standard of care by failing to perform "a significant work up for cardiac problems," but did not specify "what should have been done differently." *Palacios*, 46 S.W.3d at 880. Although she generally mentioned that "[n]o lab work such as Beta NP was ordered," she did not express whether a Beta NP was a test that *should have* been performed or merely *could have* been performed. *See Thomas*, 230 S.W.3d at 858 ("[S]tatements concerning the standard of care and breach need only identify what care was expected and not given with such specificity that inferences need not be indulged to discern them.").

Second, Dr. Downing stated that Dr. Giannone breached a standard of care by discharging Andrews despite her elevated temperature. Again, there is no mention regarding what should have been done differently, i.e., whether Dr. Giannone should have ordered that Andrews remain in the emergency room or be moved to another department in the hospital for additional treatment. Dr. Downing's statement that Dr. Giannone committed negligence by discharging Andrews may address the breach of a standard of care, but does not adequately set forth the actual standard. *See Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216, 224 (Tex. App.—Houston [1st Dist.] 2003,

pet. denied) ("To the extent that the reports state what an ordinarily prudent physician would not have done, i.e., what [the defendant physician] did, the reports are addressing a breach of the standard of care rather than the applicable standard of care itself.").

Third, Dr. Downing stated that Dr. Giannone breached a standard of care by failing to prescribe antibiotics for Andrews despite her elevated temperature and bronchitis. This statement is conclusory because Dr. Downing did not specify what type and dosage of antibiotics should have been prescribed in light of Andrews's conditions or for what duration the antibiotics should have been administered. *See Norris v. Tenet Houston Health Sys.*, No. 14-04-01029-CV, 2006 WL 1459958, at *7 (Tex. App.—Houston [14th Dist.] May 30, 2006, no pet.) (mem. op.) (explaining expert failed to adequately state the standard of care because, among other deficiencies, he did not specify required dosage for patient in same condition as plaintiff).

Fourth, Dr. Downing stated that Dr. Giannone breached a standard of care by failing to advise Andrews to consult a physician the following day and by failing "to make certain that a qualified physician follow up with appropriate questions on the [following] day." These statements are conclusory and do not adequately set forth the standard of care because there is no explanation regarding the type of follow-up appointment Dr. Giannone should have recommended or what questions Dr. Giannone should have ensured the physician asked Andrews, e.g., whether Dr. Giannone should have referred Andrews to a cardiac or pulmonary specialist or merely advised her to consult a general practitioner.

Finally, Dr. Downing stated that Dr. Giannone breached a standard of care by failing to appreciate cardiomegally on the CXR (chest x-ray). However, there is no statement indicating that Dr. Giannone had a duty to order and review chest x-rays in this situation. *See Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex. 2006) (per curium) ("[N]either of [plaintiff's] expert reports asserts that [defendant physician] was ever provided with the x-ray results or had any independent duty to review them. Instead, the court of appeals indulges multiple inferences that are simply unsupported by the scant

reports."). Furthermore, Dr. Downing did not even state whether these conditions were actually detectable from the x-ray.

Accordingly, we hold that the trial court erred by determining that appellees presented an expert report in which a fair summary of the applicable standards of care was provided. Additionally, without information regarding the standards of care, we are unable to determine whether Dr. Downing provided a fair summary of Dr. Giannone's alleged breach of the applicable standards, and so was the trial court. *See De Leon v. Vela*, 70 S.W.3d 194, 199 (Tex. App.—San Antonio 2001, pet. denied) ("[Expert physician's] failure to set forth what the applicable standard of care was makes it impossible for us to determine whether the standard of care De Leon was entitled to was ever breached.").

Relative to causation, we conclude Dr. Downing did not adequately explain why Dr. Giannone's alleged breaches of the standards of care caused damages. She opined that Dr. Giannone's negligence "contributed to the patient's untimely demise" and "in [her] medical opinion[,] were responsible for the demise of [the patient]." Dr. Downing failed to describe or opine regarding the causal link between Dr. Giannone's negligence and Andrews's death. Instead, Dr. Downing's opinion is based on bare assertions regarding causation without explanation regarding the predictable results if Dr. Giannone had followed the standards. Dr. Downing's numerous conclusory statements that certain breaches of standards "contributed to the cause of the patient's death" are not adequate to fulfill the requirements prescribed in section 74.351(r)(6). An expert must explain the basis for her conclusions relative to causation and sufficiently describe the facts that establish a causal link to the patient's demise. *Constancio v. Bray*, 266 S.W.3d 149, 157–59 (Tex. App.—Austin 2008, no pet.) (distinguishing between reports in which author fails to link her conclusions regarding causation to breaches of standards of care and reports that adequately link patient's injury to practitioner's negligence). Accordingly, we hold the trial court abused its discretion by denying Dr. Giannone's motion based on

13

the contention that Dr. Downing's opinions regarding causation are conclusory. *See Jelinek*, 328 S.W.3d at 539–40. Dr. Giannone's second and third issues are sustained.

## III. CONCLUSION

After concluding that an expert report is inadequate, a court of appeals may remand for the trial court to decide whether to grant an extension of time for a claimant to cure the report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c); *Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex. 2008). Accordingly, we reverse the trial court's order denying Dr. Giannone's motion to dismiss and remand for the trial court to consider whether to grant an extension of time for appellees to rectify the above described deficiencies under section 74.351(c).

/s/    Charles W. Seymore
Justice

Panel consists of Justices Frost, Seymore, and Jamison.