

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00486-CV

TEXAS HEALTH HARRIS
METHODIST HOSPITAL FORT
WORTH, HARRIS METHODIST
HOSPITALS INC., TEXAS HEALTH
RESOURCES, AND COMMUNITY
BLOOD CENTER D/B/A
COMMUNITY TISSUE SERVICES

APPELLANTS

V.

WILLIAM AUSTEN BIGGERS;
WILLIAM ANGUS BIGGERS, III,
INDIVIDUALLY AND AS GUARDIAN
OF THE PERSON AND ESTATE OF
WILLIAM AUSTEN BIGGERS; AND
LILLIE KAY BIGGERS

APPELLEES

### NO. 02-13-00040-CV

DIANA B. WILSON, M.D.

APPELLANT

V.

WILLIAM AUSTEN BIGGERS;
WILLIAM ANGUS BIGGERS, III,
INDIVIDUALLY AND AS GUARDIAN
OF THE PERSON AND ESTATE OF
WILLIAM AUSTEN BIGGERS; AND
LILLIE KAY BIGGERS

APPELLEES

------------

FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

----------

# MEMORANDUM OPINION[1]

----------

Appellants Texas Health Harris Methodist Hospital Fort Worth (Harris Methodist), Harris Methodist Hospitals Inc., Texas Health Resources (collectively, the hospital defendants), Community Blood Center d/b/a Community Tissue Services (Community), and Diana B. Wilson, M.D. appeal the trial court's denial of their motions to dismiss appellees William Austen Biggers, William Angus Biggers, III, individually and as guardian of the person and estate of William Austen Biggers, and Lillie Kay Biggers's claims against them. We reverse and remand.

## Background Facts

In March 2010, William Austen was involved in a car crash that resulted in severe head injuries. He was taken to Harris Methodist where he was treated by neurosurgeon Dr. Diana Wilson among others. William Austen underwent an emergency craniectomy during which part of his skull was removed to relieve pressure and to allow surgery. Surgeons later determined that they would not be able to replace the piece of skull that was removed (the "bone flap") because it had not been properly stored. Instead, they replaced that part of William

---

[1]*See* Tex. R. App. P. 47.4.

2

Austen's skull with artificial implants. William Austen suffered repeated infections from the implants and required additional surgeries on his skull because of them.

The Biggerses sued the hospital defendants, Community, and Dr. Wilson, alleging a number of negligent acts including failure to adequately assess William Austen's injuries, failure to provide adequate information for his family to make informed decisions regarding William Austen's care, allowing inadequately trained or qualified doctors to perform surgery on William Austen, and failure to properly maintain the portions of William Austen's skull that were removed in surgery.[2]

The Biggerses filed an expert report and curriculum vitae of Dr. Arnold Ravdel, an orthopedic surgeon, as required under chapter 74 of the civil practices and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2011). The hospital defendants, Community, and Dr. Wilson all objected to the sufficiency of Dr. Ravdel's expert report and moved to dismiss the Biggerses' claims against them. The trial court denied their motions. The hospital defendants and Community appealed and, later, so did Dr. Wilson. We consolidated the two appeals.

## Standard of Review

We review a trial court's denial of a motion to dismiss for an abuse of discretion. *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Maris v.*

---

[2]The Biggerses also sued, and later nonsuited, two other doctors, Dr. Smith and Dr. Colquitt, neither of whom is a party to this appeal.

*Hendricks*, 262 S.W.3d 379, 383 (Tex. App.—Fort Worth 2008, pet. denied); *Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 290–91 (Tex. App.—Fort Worth 2008, pet. denied). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

**The Chapter 74 Expert Report Requirement**

The purpose of the expert report requirement is to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)). An expert report "need not marshal all the plaintiff's proof." *Palacios*, 46 S.W.3d at 878 (construing former article 4590i, § 13.01). Additionally, the information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879. However, if a report omits any of the statutory elements, it cannot be a good-faith effort. *Id.* A report that merely states the

4

expert's conclusions about the standard of care, breach, and causation is not sufficient. *Id.*

A defendant may meet the requirements of chapter 74 through multiple reports. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i). A single report need not "address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider." *Id.* But read together, the reports must provide a "fair summary" of the experts' opinions regarding the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351 (r)(6).

If the defendant files a motion challenging the adequacy of the expert report, the court shall grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(l). An expert report is defined as a report that "provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). The trial court may grant one thirty-day extension to cure a deficiency in the expert report. *Id.* § 74.351(c).

5

**Discussion**

The appellants complain that Dr. Ravdel's report is deficient for a number of reasons. All the appellants argue that Dr. Ravdel failed to set forth the applicable standard of care for each defendant, failed to articulate how each defendant breached the standard of care, and failed to explain the causal connection between each defendant's breach and William Austen's injuries. Harris Methodist Hospitals Inc. and Texas Health Resources argue that Dr. Ravdel's report wholly fails to address them and thus constitutes no report at all as to them. Harris Methodist and Community also both argue that Dr. Ravdel is not qualified to render opinions as to them.

## I. Harris Methodist Hospitals Inc. and Texas Health Resources

Harris Methodist Hospitals Inc. and Texas Health Resources argue that Dr. Ravdel's report wholly fails to address them and thus the Biggerses failed to timely serve an expert report as to them. The Biggerses make no argument in response in their brief. In oral argument, they claimed that someone informed them that the three hospital defendants "are all the same entity." Nothing in the record supports this contention, and we note that all three hospital defendants filed separate answers. In Harris Methodist Hospitals Inc.'s and Texas Health Resources's answers, they both stated that they were not proper parties to the suit and were improperly named. The Biggerses do not claim that Harris Methodist Hospitals Inc. or Texas Health Resources are vicariously liable for the

6

hospital's actions. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Texas 2013).

If a report fails to address a defendant health care provider, it constitutes no report as to that defendant. *See Apodaca v. Russo*, 228 S.W.3d 252, 257 (Tex. App.—Austin 2007, no pet.). When no expert report has been timely served, a trial court has no authority to grant an extension and must dismiss the claims with prejudice. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *Garcia v. Marichalar*, 185 S.W.3d 70, 74 (Tex. App.—San Antonio 2005, no pet.). Dr. Ravdel states in the report that its purpose is "to explain how, in reasonable medical probability, Texas Health Harris Methodist Hospital . . . [,] Community Blood Center . . . , and Diana Wilson, M.D. failed to follow standards of care." Dr. Ravdel's report makes no mention of either Harris Methodist Hospitals Inc. or Texas Health Resources at any point. The Biggerses thus failed to serve an expert report as to these two parties. Because the Biggerses did not serve an expert report, the trial court was required to dismiss their claims against Harris Methodist Hospitals Inc. and Texas Health Resources. It erred by not doing so. We therefore sustain the part of the hospital defendants' first issue addressing the report's deficiency as to Harris Methodist Hospitals Inc. and Texas Health Resources.

7

**II. Dr. Ravdel's qualifications as an expert on Harris Methodist and Community**

Harris Methodist and Community argue that Dr. Ravdel is not qualified to opine on their liability.

An expert providing a report must have "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim" and be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b). A physician-expert who proffers an opinion on the applicable standard of care of another type of healthcare provider must "affirmatively demonstrate experience and familiarity with the standard of care for the nonphysician's field." *Tawa v. Gentry*, No. 01-12-00407-CV, 2013 WL 1694869, at *13 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.). If a physician states he is familiar with the standard of care and responsibilities and requirements for healthcare providers, and he has worked with, interacted with, and supervised healthcare providers, the physician is qualified on the issue of whether the healthcare providers departed from the accepted standards of care for healthcare providers. *See San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 814 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Dr. Ravdel's curriculum vitae states that he completed a general surgery residency and an orthopedic surgery residency and then practiced orthopedic

8

surgery in South Africa. His curriculum vitae states that he has been in private practice in Houston, Texas from 1977 to present. He states in his report,

> All of the opinions expressed in this report are within reasonable medical probability and based on my education, training[,] and experience as a surgeon and physician having over fifty years of experience, and including doing surgeries that involve bone grafts and tissue grafts. I am fully familiar with standards of care that involve preservation of tissue and storing of tissue by surgeons and hospitals.

Although Dr. Ravdel states that he has peer reviewed cases in which spinal and neurosurgery had been done by his colleagues, he does not state that he himself has ever performed surgery involving bone flaps removed from a skull.

Dr. Ravdel's curriculum vitae and expert report show no indication that he is familiar with the standard of care for a tissue bank like Community. He states that he is familiar with the standards of care for "preservation of tissue and storing of tissue by surgeons and hospitals," but he does not state that he has any knowledge or experience with the cleaning or storage procedures of tissue banks and whether they differ from those of a hospital or with the transfer procedures from the hospital to the tissue bank. He therefore has not affirmatively demonstrated his experience with tissue banks and he is not qualified to opine on Community's liability. We sustain that part of Community's issue regarding Dr Ravdel's qualifications.

Neither has Dr. Ravdel demonstrated that he is qualified to opine on Harris Methodist's liability. He states that he has peer reviewed neurosurgery cases, but he does not state that he peer reviewed anything other than the

9

neurosurgeon's performance. He states that he reviewed "recent medical literature" but does not state what that literature was or where it was published. Dr. Ravdel does not state whether he has worked or interacted with hospital staff to preserve and store tissue or that he has any knowledge of hospital procedures beyond a cursory statement that he is "fully familiar with standards of care that involve preservation of tissue and storing of tissue by . . . hospitals." Although Dr. Ravdel might indeed have knowledge of these procedures, there is nothing in his report from which a trial court could conclude that he is familiar with the standards of care for hospitals. *See Tawa*, 2013 WL 1694869, at *14 (holding that doctor was not qualified to opine on nurse practitioner's standard of care when "[h]e [did] not claim to have experience training or supervising nurse practitioners or provide any other basis for the trial court to conclude that he was familiar with such standard"); *Perry v. Bradley*, No. 10-10-00402-CV, 2011 WL 6415135, at *3 (Tex. App.—Waco Dec. 21, 2011, no pet.) (mem. op.) (holding that report that did not state how the pharmacist was knowledgeable about standards of care was deficient when such knowledge was not clear from his training or experience). We therefore sustain that part of the hospital defendants' first issue regarding Dr. Ravdel's qualifications.

## III. Standards of care and breaches[3]

Harris Methodist, Community, and Dr. Wilson all challenge the adequacy of Dr. Ravdel's report concerning the standards of care applicable to them and any breaches they allegedly committed. Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880. Identifying the standard of care is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Id.* While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected but not given. *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 748 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

---

[3]Although we have held that Dr. Ravdel's report is insufficient as to the hospital defendants and Community, because we will remand the case to the trial court so that it may consider granting a thirty-day extension to cure the deficiencies, we will address the remaining deficiencies alleged by the appellants.

11

Dr. Ravdel's report includes five paragraphs on "[s]tandards of care that apply to any surgeries involving preservation of bone tissue for use in later surgeries or procedures." He states,

> [T]he part of bone or other tissue needs to be evaluated and cleaned, then may be stored in the treating hospital . . . or depending on circumstances, may be sent to what we call a "bone bank" or "tissue bank" for standard preservation procedures[,] which are basically freezing the tissue and labeling it appropriately to the patient's identity as well as identifying what it is. This procedure should be documented in the patient's chart, in accordance with standards of care. Specifically, . . . the hospital chart should include documentation of what was done with the tissue, when it was transmitted to the bone or tissue bank and records of receipt and associated activity, including when the material is received by the surgeon for restoration. These standards are well-known to surgeons in all specialties where bone or tissue grafts are utilized and to hospitals and bone or tissue banks.

> . . . .

> [S]imple cleaning of the skull material and storage in a simple freezer at around -18 degrees Centigrade is effective for lengthy periods of time. Accordingly, if standards are followed, the natural skull tissue should be viable and not contaminated or deteriorated within one year and longer, if proper procedures are undertaken by the hospital where the neurosurgery and associated staff are planning restorative surgery.

> . . . .

> Under standards of care applicable to hospitals and to all surgeons handling tissue or bone material intended to be utilized later in the same patient as in this case, the surgeon or his or her staff or associates must document what steps were taken to preserve the integrity of the tissue, including such things as cleaning, removal of associated traumatized or necrotic tissue, plans for packaging (typically in a plastic bag or container and sometimes accompanied by prophylactic anti-infection agents)[,] and freezing in storage.

12

Under the "harm" section of his report, he states,

> Removal of the part of the skull in this type of situation is not uncommon, but the material needs to be properly maintained in a bone bank. This is mainly the responsibility of the hospital in conjunction with the bone bank, but it is up to the neurosurgeon who does the craniectomy to see that the removed material is properly prepared and that plans for storage and maintenance are appropriate.

Dr. Ravdel's report implies that the same standard of care applies to Harris Methodist, Community, and Dr. Wilson. While it is possible to apply a single standard of care to all defendants, there still must be an explanation as to why the same standard applies to very different types of providers. *See Kettle v. Baylor Med. Ctr. at Garland*, 232 S.W.3d 832, 839 (Tex. App.—Dallas 2007, pet. denied) ("While it is certainly *possible* an identical standard of care governs different providers, a generalized statement without explanation that a uniform standard applies 'can reasonably be deemed conclusory' and deficient.") (quoting *Gray v. CHCA Bayshore, L.P.*, 189 S.W.3d 855, 859–60 (Tex. App.—Houston [1st Dist.] 2006, no pet.)). Dr. Ravdel's report fails to explain how a tissue bank, a hospital, and a neurosurgeon would have identical standards of care as to the preservation and storage of a bone flap. Because the report does not specify what tasks each defendant was responsible for, it does not explain what each defendant did to breach the standard of care. See *Palacios*, 46 S.W.3d at 880 (stating that whether a defendant breached the standard of care cannot be determined without "specific information about what the defendant should have

13

done differently"); *Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 245–46 (Tex. App.—Corpus Christi 2004, no pet.) (holding expert report deficient when it presented only a single standard of care for all defendants and did not specify "which party was responsible for undertaking which procedures").

Dr. Ravdel states that the patient's chart does not include documentation regarding "what steps were taken to preserve the integrity of the tissue, including such things as cleaning, removal of associated traumatized or necrotic tissue, plans for packaging . . . [,] and freezing in storage." He does not specify which of the defendants should have documented those steps or if one defendant should have documented some steps and another defendant document the others. *See Jones v. Ark-La-Tex Visiting Nurses, Inc.*, 128 S.W.3d 393, 397 (Tex. App.—Texarkana 2004, no pet.) (holding that expert's report was inadequate because it "[did] not differentiate between what the hospital did wrong and what the nurses did wrong"). Although he does state that "the surgeon or his or her staff or associates" are responsible for documenting the preservation of the tissue, it is unclear from his report how or why a doctor would be responsible for documenting steps that occur after the specimen has left her possession or whose responsibility it is to actually clean and store the bone flap. And it was critical that the expert report explain this latter duty, because the Biggerses did not allege—and Dr. Ravdel did not claim—that the lack of documentation caused William Austen's injuries. Therefore, even if the report did set out *a* standard of

14

care for Dr. Wilson, it was not *the* standard of care relevant to the Biggerses' claims.

Dr. Ravdel states that either the hospital or the bone bank "improperly maintained or stored this patient's skull material," but he does not explain what either defendant should have done differently. *See Kingwood Pines*, 362 S.W.3d at 750 (holding that expert reports were deficient in identifying the breaches of the standards of care when they merely stated that the patient should have been kept in a secure environment, but failed to articulate how the defendants should have accomplished that task). He then suggests that "some other entity" might have been responsible for the deterioration, but he fails to explain what that entity might have been, how it would have been involved, or how he determined that this other entity was not responsible.

Dr. Ravdel's statement that the maintenance of the bone flap "is mainly the responsibility of the hospital in conjunction with the bone bank, but it is up to the neurosurgeon" does not explain which defendant should have communicated storage plans or to whom the information should have been directed. *See Taylor*, 169 S.W.3d at 245 (holding that expert's report was deficient as to the standard of care for defendants when expert did not address the standard for each defendant or explain who was responsible for the alleged breaches). He does not explain which defendant was responsible for the cleaning of the bone flap. He states that procedures "should be documented in the patient's chart," but he does not explain who was responsible for updating William Austen's chart.

15

*See Intra-Op Monitoring Servs., LLC v. Causey*, No. 09-12-00050-CV, 2012 WL 2849281, at *3 (Tex. App.—Beaumont July 12, 2012, no pet.) (mem. op.) (holding expert report deficient regarding standard of care when report did not explain "which of the several defendants failed to properly interpret the monitoring data [and] what monitoring data was not properly interpreted"). Dr. Ravdel's report does not identify the conduct of each defendant that the Biggerses have called into question. *See Palacios*, 46 S.W.3d at 879 (requiring a good-faith effort to inform the defendant of the conduct the plaintiff has called into question and provide a basis for the trial court to conclude that the claims have merit).

Because the expert report does not identify what each defendant should have done differently, it provided no basis for the trial court to determine whether each defendant breached a duty owed to William Austen. *See Palacios*, 46 S.W.3d at 880. We sustain the hospital defendants' first issue and Community's and Dr. Wilson's sole issues as to the elements of standard of care and breach.

## IV. The causal connections

Harris Methodist, Community, and Dr. Wilson also challenge Dr. Ravdel's report on the ground that it does not explain the causal connection between their alleged negligent acts and William Austen's injuries. While a claimant is not required to conclusively prove his case through an expert report, the report may not merely state conclusions about any of the elements. *Palacios*, 46 S.W.3d at 879. The expert must explain the basis of his statements linking the facts to his

16

conclusions. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

Dr. Ravdel's report discusses two problems with William Austen's care. First is the lack of documentation in William Austen's records. Dr. Ravdel states, "I have not seen that documentation, but it may not be pertinent, as it may only show details of when the material was received, checked out for evaluation if that was done, and removed for use in restorative surgery." He makes no connection between the lack of recording of the steps taken to clean and preserve the bone flap to any of William Austen's injuries. *See Taylor*, 169 S.W.3d at 245 (holding expert report deficient when it "[did] not explain how, if at all, this information would have altered the outcome"); *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.) (criticizing the expert report as insufficient because it did not "explain the causal connection between [the hospital's] claimed omissions . . . and [the patient's] death").

The second issue Dr. Ravdel discusses is the cleaning and preservation of the bone flap. His report states that the records he reviewed did not provide the details of how the bone flap was maintained and stored, but that a failure to properly clean, maintain, and store the bone tissue was "probably what happened in this case" because William Austen's injuries "are the common results of improper storage by whatever means." He also states,

> It is possible that this patient might have had infections even if the original cranial material had been usable and used in repairing his skull, but infections are much less likely in that situation because

17

of the healing and integration of natural bone. The loss of the original cranial material definitely caused harm to this patient by necessitating additional surgeries, costs of implants, and accompanying increased risk of infections and actual infections and cost of treatment.

His later statement that "[t]he failure to maintain adequately the skull materials in this case, in reasonable medical probability, caused harm to this patient because it led to the necessity of what are described as 'multiple' corrective surgeries" is conclusory and not supported by his previous statements that William Austen might still have suffered the infections and multiple surgeries if the bone flap had been useable. *See Clapp v. Perez*, 394 S.W.3d 254, 261–62 (Tex. App.—El Paso 2012, no pet.) ("Although broad and sweeping in scope, this statement is nothing more than Dr. Herrera's conclusion that the breach caused the injury."). Moreover, Dr. Ravdel does not state whose failure led to William Austen's harm and as discussed above, even indicated that "some other entity" may have been responsible. *See id.* ("Moreover, Dr. Herrera fails to link Perez's death to any specific physician."); *Davisson v. Nicholson*, 310 S.W.3d 543, 559 (Tex. App.—Fort Worth 2010, no pet.) (holding that reports that failed to fault defendant for plaintiff's injuries were inadequate). Dr. Ravdel's report thus did not adequately explain the causal connection between the alleged breaches of the standards of care and William Austen's injuries. We sustain the remainder of the hospital defendants' first issue and Community's and Dr. Wilson's sole issues as to this element.

18

## V. Attorney's fees

In their second issue, the hospital defendants argue that they should have been awarded attorney's fees. Chapter 74 allows for the recovery of attorney's fees and costs of court when a plaintiff fails to file an expert report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b). Chapter 74 also allows the trial court to consider a thirty-day extension when a report has been filed but found to be deficient. *Id.* § 74.351(c). Because we found Dr. Ravdel's expert report to be deficient regarding Harris Methodist, Community, and Dr. Wilson, the Biggerses are entitled to have the trial court consider whether to grant a 30-day extension to cure the deficiencies as to those defendants. *See id.* But because the Biggerses did not file an expert report as to Harris Methodist Hospitals Inc. and Texas Health Resources, they are not entitled to an extension to file a report addressing their claims against those providers, and the trial court must dismiss the Biggerses claims against them and consider their request for attorney's fees. *See Psychiatric Solutions, Inc. v. Palit*, No. 12-0388, 2013 WL 4493118, at *3 (Tex. Aug. 23, 2013) (remanding case to the trial court with instructions to dismiss plaintiff's claim against provider and to consider provider's request for attorney's fees and costs). We sustain the hospital defendants' second issue as to Harris Methodist Hospitals Inc. and Texas Health Resources and overrule it as to Harris Methodist.

## Conclusion

Having sustained Dr. Wilson's and Community's sole issues and the hospital defendants' first issue as to Harris Methodist, we reverse the trial court's judgment as to those defendants and remand the case to the trial court so that it may consider a 30-day extension to cure the deficiencies in the expert report. Having sustained the hospital defendants' first and second issues as to Harris Methodist Hospitals Inc. and Texas Health Resources, we reverse the trial court's judgment as to those defendants and remand the case to the trial court with instructions to dismiss the Biggerses' claims against them and to consider their request for attorney's fees and costs.

LEE GABRIEL
JUSTICE

PANEL:  MCCOY and GABRIEL, JJ.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment)

DELIVERED:  October 3, 2013

20